KINGDOM OF SWEDEN, Plaintiff, v. NEW YORK TRUST COMPANY et al., Defendants.

Supreme Court, Special Term, New York County, December 14, 1949.

*Ralph M. Carson, Edward J. McGratty* and *James J. Higginson* for plaintiff.

*Orison S. Marden* and *Edgar E. Barton* for New York Trust Company, defendant.

*Leonard Bisco* and *Lester E. Denonn* for Manufacturers Trust Company, defendant.

ISIDOR WASSERVOGEL, Official Referee. The plaintiff seeks to recover from the defendants the sum of approximately $176,000 as damages for alleged breaches of warranties by both of them with respect to certain negotiable warehouse receipts and for the alleged unauthorized transfer by the defendant New York Trust Company of plaintiff's letter of credit.

With the exception of the defendants' actual knowledge of certain governmental restrictions, which will be dealt with separately, the facts giving rise to the controversy between the parties are substantially conceded by all of them. Such controversy centers primarily about the inferences to be drawn from the facts and the law applicable to them. As the time element is an essential factor in this action, I deem it advisable to set forth the salient facts in chronological order.

In the latter part of 1939 the Sveriges Riksbank (hereafter referred to as the "Swedish Bank") entered into an agreement with the defendant New York Trust Company whereby the latter agreed to waive its customary fee for confirmation of credits issued by the Swedish Bank if such credits were covered by cash at the time they were opened. In subsequent transactions, the Swedish Bank's "Current Cash Account" maintained in the defendant New York Trust Company was debited at such times as the credits were confirmed, and such transactions were reflected as credits on the defendant's books in an account known as "Cash Commercial Letters of Credit — Sveriges Riksbank."

Prior to the official entry of the United States into World War II there was a critical shortage of toluene, a product essential in the manufacture of TNT and other high explosives. Inasmuch as this product was considered vital to our defense program, on December 30, 1941, the War Production Board, under authority delegated to it by the President, issued an amendment to its Order M-34, which restricted the production and use of

commercial grade toluene after February 1, 1942, and prohibited the delivery of nitration-grade toluene from the effective date of such order, December 30, 1941. The difference between nitration-grade toluene and commercial grade toluene is that the former has the highest degree of purity and is suitable for the manufacture of explosives, whereas the commercial grade has a slight paraffin contamination and is restricted to uses in the pharmaceutical industry, for production of lacquer thinner, adhesives, etc. Nitration-grade toluene was the product covered by the warehouse receipts involved in this action.

The amended order of the War Production Board was immediately published in the Federal Register. (6 Federal Register 6853.) The full text of the order also appeared in the *New York Journal of Commerce,* while many other papers carried commentaries on the action taken by the Government agency. The amended order, insofar as it relates to nitration-grade toluene, provided: " After the effective date of this Order, no Producer shall deliver Nitration Grade Toluene to any person, except as may be specifically authorized by the Director of Priorities; and no person shall accept delivery of Nitration-Grade Toluene in violation of the foregoing clause." (6 Federal Register 6853.)

The toluene involved in the instant action was stored in the tanks of General American Tank Storage Terminals in Carteret, New Jersey, under nine warehouse receipts, and was owned by the Triton Chemical Corporation. In January, 1942, the United States Government condemned the Triton plant, which was used for the manufacture of explosives. On or about January 16, 1942, the Office of Production Management became aware of the existence of Triton's toluene stored at Carteret, New Jersey, and notified the warehouseman not to release it without specific authorization of the governmental agency. Triton previously had agreed to sell the toluene to one Altman, a New York City commodity broker. Altman, in turn, offered the toluene to Refiners Export Company of Houston, Texas. Refiners Export Company then cabled to the Swedish Marine Board, the purchasing department of the Swedish Government in Stockholm an offer to sell the same toluene. The offer was accepted on January 19, 1942, but Refiners Export Company was requested to deal directly with the Swedish Government Supplies Board, which was also an agency of the Swedish Government.

Upon confirmation of the contract of purchase through the Swedish Government Cargo Clearance Committee, a Swedish Government agency charged with assembling and shipping

cargoes from this country to Sweden, Refiners Export Company cabled the defendant New York Trust Company and advised it of its purchase of the toluene from Altman against payment by letter of credit. Refiners Export Company also informed the defendant New York Trust Company that it was expecting a credit in its favor from the Swedish Bank. On January 21, 1942, the Swedish Bank cabled the defendant New York Trust Company as follows: "Order Swedish State Reserve Supply Board Stockholm favors Refiners Export Co Houston Texas Open irrevocable credit 2921 for about U. S. $172,000, available until March 15th 1942 against invoice intriple warehouse receipt issued to Manufacturers Trust Co New York endorsed in blank by Manufacturers Trust Co inspection certificate issued by E W Saybolt and Co covering 800/825 tons one degree nitration toluol at U. S. cents 67 per U. S. gallon plus one half inspection charges free in storage Deep Water Terminal eastern seaboard part shipments allowed fire insurance covered here confirm beneficiary stop after presentation please deliver warehouse receipt inspection certificate and two invoice copies to Swedish Cargo Clearance Committee New York against receipt."

The defendant New York Trust Company notified Refiners Export Company by teletype of the contents of this cable and advised it that it had confirmed the Swedish Bank's credit under its commercial credit No. 37173. Refiners Export Company then requested the defendant New York Trust Company to re-establish on its confirmed credit a credit to Altman. Said defendant informed Refiners Export Company that such a letter of credit would be issued to Altman only if the Second National Bank of Houston, Texas, requested that this be done.

On January 22, 1942, pursuant to arrangement made in 1939, the "Current Cash Account" of the Swedish Bank in the New York Trust Company was debited for $172,000, and the "Cash Commercial Letters of Credit — Sveriges Riksbank Account" was credited for an equal amount. On the same day the Second National Bank of Houston, Texas, requested the New York Trust Company to establish a letter of credit as its agent for the account of Refiners Export Company in favor of Altman, or order, in an amount not exceeding $133,000, payable against the same documents required by credit No. 37173, and to retain this confirmed credit as security for the Texas bank. The issuance of the credit to Altman was approved by an officer of the defendant New York Trust Company, which thereupon issued

its credit No. 37178 for $133,000. On January 23, 1942, Altman received the letter of credit in his favor from the New York Trust Company.

On January 28, 1942, Altman requested the New York Trust Company to allow the presentation of the documents under his credit No. 37178 to be made to a representative of the New York Trust Company at the Manufacturers Trust Company's offices. The New York Trust Company consented to this unusual practice and, upon the receipt of the documents provided by Altman, including eight warehouse receipts which were duly indorsed by the defendant Manufacturers Trust Company, the defendant New York Trust Company delivered its check for $131,167.50 to the defendant Manufacturers Trust Company. On the same day, when the representative of the New York Trust Company returned to its offices with the documents presented by Altman at the offices of the Manufacturers Trust Company, he made a series of entries in the internal books of the New York Trust Company which, concededly, were irregular and did not reflect the transaction as it stood at the time such entries were made. Although the defendant New York Trust Company had used only $131,167.50 of its funds in the transaction at the offices of the defendant Manufacturers Trust Company, the "Cash Commercial Letter of Credit — Sveriges Riksbank Account" was debited for $172,000, and the "Current Cash Account" was debited for $3,956.32. The difference between these amounts, which were charged against the Swedish Bank's accounts, and the $131,167.50 which was actually paid to the Manufacturers Trust Company, namely $44,432.97, was credited to the Second National Bank of Houston, Texas, in an account called "Items Awaiting Disposition."

These entries admittedly were erroneous as of the date they were made because the defendant New York Trust Company did not, at that time, have the documents which were required under the confirmed letter of credit No. 37173. It could not, therefore, properly charge the Swedish Bank for the full amount called for by such documents. Concededly, these entries constituted an attempted shortcut in the bookkeeping records which would be required by the defendant bank had the transaction actually been completed on January 28, 1942.

On that day, January 28, 1942, the New York Trust Company prepared a formal debit advice letter to the Swedish Bank informing it of the fact that $175,778.45, plus commission, had been debited to its account. The date on which such letter was actually mailed to the Swedish Bank is one of the items in

dispute, plaintiff alleging that such letter was actually mailed on January 28, 1942, and the defendant New York Trust Company contending that it was not forwarded to the Swedish Bank until January 31, 1942, when all of the documents required under the letter of credit were actually in its possession.

On January 29, 1942, an attorney for the Triton Chemical Corporation informed the War Production Board that it had sold the toluene. It was not until January 31, 1942, however, that the government agency was able to reach Altman, who by that time had completed the negotiations and transfer of the warehouse receipts as above stated.

On January 30, 1942, a representative of Refiners Export Company presented its invoices and drafts to the defendant New York Trust Company. This was done after banking hours and, therefore, all entries made in the defendant's books reflect such proceedings as having occurred on the following day. The drafts submitted by Refiners Export Company represented the $175,780.45 for which the Swedish Bank's accounts had been debited on January 28, 1942, with the exception of an item of $175.87 for commissions. In addition to the debited amount, the drafts submitted by Refiners also represented an additional $402, which was the amount due for the balance of the toluene evidenced by a ninth warehouse receipt received from Altman. A check was drawn by the defendant New York Trust Company for $44,532.47 to the Chase National Bank for the account of the Second National Bank of Houston, Texas, for use of the Refiners Export Company. This check represented the amount credited in the "Items Awaiting Disposition" account of the New York Trust Company on January 28, 1942, plus the amount due on the second draft for $402.

On February 2, 1942, the nine warehouse receipts, two commercial invoices from Refiners Export Company to the Swedish State Reserve Supply Board, and a required inspection certificate were forwarded to the Swedish Cargo Clearance Committee by the defendant New York Trust Company.

On February 6, 1942, the War Production Board, which had previously contacted Altman, the Swedish Government agencies in this country, and representatives of Triton Chemical Corporation and Refiners Export Company, and was now aware of the disposition of the toluene, again instructed the warehouseman in New Jersey not to release any of this toluene from storage. On February 13, 1942, the United States formally requisitioned such toluene for defense purposes. Notice thereof was given to all parties concerned on March 3, 1942. Prior

thereto, the requisition order was served on the warehouseman, who made delivery of the toluene to the Ordnance Department of the Army. On July 28, 1944, the War Department informed the Swedish Cargo Clearance Committee of its award of compensation for the toluene in the sum of $78,763.20, which, less storage charges, was deposited in the United States Treasury subject to withdrawal by duly authorized persons.

Plaintiff contends that the defendants, jointly and severally, are liable for the full amount disbursed from the Swedish Bank's account in the defendant New York Trust Company for the above-stated transaction on the following grounds:

1. The delivery of the warehouse receipts representing nitration-grade toluene was an illegal act.

2. The defendant Manufacturers Trust Company, by virtue of its indorsement and transfer of the warehouse receipts on behalf of Altman to the defendant New York Trust Company on behalf of Refiners Export Company, is liable for breach of warranty.

3. The defendant New York Trust Company is liable for breach of warranty by reason of its acceptance of the warehouse receipts for nitration-grade toluene on behalf of Refiners Export Company, and by virtue of its delivery of such warehouse receipts on behalf of Refiners Export Company to itself on behalf of plaintiff.

4. The defendant New York Trust Company is liable for breach of implied warranties with respect to due care, diligence, and observance of the proper conduct required by it as an agent of plaintiff under the letter of credit agreement.

The defendant New York Trust Company contends at the outset that the absence of privity between the plaintiff and itself precludes the maintenance by the Kingdom of Sweden of this action. The New York Trust Company further alleges that it violated no duty to plaintiff by either the issuance of the letter of credit to Altman or the payments which were made pursuant to such letter. It is the contention of this defendant that none of the acts performed by it were illegal, under any of the applicable regulations of the United States Government or otherwise.

The Manufacturers Trust Company, which was made a party to this action solely by virtue of its indorsement of the documents involved herein, contends that such action on its part did not create any warranties, but, in the event the court held that such indorsement created certain warranties, such warranties were not breached by any action on its part.

Generally a defendant's allegation that the plaintiff is not the real party in interest must be set forth as an affirmative defense in its answer and must be raised before trial (*Spooner* v. *Delaware L. & W. R. Co.,* 115 N. Y. 22, 30; *Wellman* v. *Holzer,* 56 N. Y. S. 2d 299, 302, affd. 271 App. Div. 775). This was not done in this case. Nevertheless, at the opening of the trial, the court granted the defendant New York Trust Company's motion to amend its answer so as to include a second defense that it had its contractual relationship with the Swedish Bank and not with the plaintiff Kingdom of Sweden. The New York Trust Company's amendment was allowed because it was made pursuant to notice given to the plaintiff several days prior to the trial, and, therefore, plaintiff could not claim surprise.

In any event, however, defendant New York Trust Company's argument in this respect is without merit. Under the laws of Sweden (Constitution, art. 72), a Swedish bank is within the direct administration of the Parliament of the Kingdom of Sweden. Six of the seven bank commissioners, who exercise powers similar to those of a bank director in this country, are appointed by Parliament. The seventh bank commissioner is appointed by the King of Sweden. The Swedish Bank is not now and never was a corporation separate from and independent of the Government of the Kingdom of Sweden. It has no stock, and all of the profits derived from its banking business go to the Swedish State as part of the revenue of the kingdom. Expert opinion by the Ambassador of Sweden, the Governor of the Swedish Bank, and the Swedish Consul General in San Francisco, which was adduced upon the trial, bears out the fact that the bank is not a separate corporate entity apart from the Swedish Government. The fact that the defendant New York Trust Company was able to locate judgments obtained in Sweden in actions wherein the Swedish Bank appeared in its individual capacity does not alter the situation. Although an offer of proof as to such judgments by the defendant New York Trust Company was denied, it might be well to state that these judgments do not necessarily indicate that the Swedish Bank has a separate jural capacity in this country or any other foreign country to the exclusion of the right of the Kingdom of Sweden to represent any of its governmental entities. The appearance of a political unit or a sovereign entity in law actions involving independent business relationships within its native land is known even in this country (*Jones* v. *City of Portland,* 245 U. S. 217, 220; *Green* v. *Frazier,* 253 U. S. 233, 235). I hold, therefore, that the plaintiff Kingdom of Sweden

is the real party in interest and has full legal capacity to maintain the instant action.

It now becomes necessary to examine the letters of credit involved herein and the mechanics of payment in transactions of this nature.

Commercial letters of credit have a long mercantile history and the principles which govern them are well established. To attempt an exact definition of a commercial letter of credit would be futile, for its variations are almost infinite. For the purpose of this action, however, a commercial letter of credit may be defined as a letter wherein the writer agrees to pay or undertakes that some other person will pay a designated amount of money in cash in exchange for specified shipping documents. The credit in connection with which the letter is used is known as the " Cash Credit ". Unless express conditions are contained in the letter of credit, the performance of the sales contract between the buyer and seller is not a condition precedent of the credit or of the buyer's agreement to reimburse. The letter of credit is a wholly independent contract (*American Steel Co.* v. *Irving Nat. Bank*, 266 F. 41; *Lamborn* v. *Lake Shore Banking & Trust Co.*, 196 App. Div. 504, affd. 231 N. Y. 616; *Imbrie* v. *D. Nagase & Co., Ltd.*, 196 App. Div. 380; *Frey & Son, Inc.*, v. *E. R. Sherburne Co.*, 193 App. Div. 849, 853; *Sztejn* v. *Schroder Banking Corp.*, 177 Misc. 719, 721).

The purpose of financing a sale where a prospective buyer in one locality desires to purchase goods of a prospective seller in another locality gave rise to the need for a ready means of transmitting the purchase price. To compel a buyer to send cash with his order or to pay cash against shipping documents would necessarily place an almost impossible burden upon his capital. The seller, on the other hand, will often refuse to accept the buyer's note, for in a place where the maker is not known, such paper is not readily marketable. When the draft of a bank is given, the seller has commercial paper of greater marketability. The buyer nevertheless still has to pay the bank cash for its draft or has to give adequate security before it will be issued. Moreover, from the buyer's point of view, there is a further disadvantage in that, in order to turn over the notes or drafts against shipping documents, he must forward these negotiable instruments to the seller or his agent. The business problem, therefore, is how to meet the desires of both the buyer and seller to enable them to consummate their transaction in the most convenient manner. How can the

seller receive his money upon shipment of the goods? How can the buyer postpone actual payment until the goods have been received and sold? How may a bank lend its credit without actually using its funds? How may the goods be utilized as security until actual payment is made therefor? The instrumentality of the commercial letter of credit enables all of the parties concerned to answer these questions and to meet and fulfill all of these requirements (McCurdy on Commercial Letters of Credit, 35 Harv. L. Rev. 539).

In the instant action an irrevocable letter of credit was opened by the Swedish Bank for the account of the plaintiff buyer through a New York correspondent, the defendant New York Trust Company, which thereby became the advising and confirming bank. The letter of credit was in favor of the beneficiary, the seller, Refiners Export Company, authorizing it to draw on the confirming bank. Upon payment of the seller's draft, the defendant New York Trust Company acquired rights against the opening bank (Swedish Bank) for reimbursement and a commission. As was the case herein, the beneficiary of the letter of credit must obtain the documents needed to draw against such letter of credit from another supplier, and that supplier in turn may require payment by a similar letter of credit. The beneficiary (Refiners Export Company) arranged for this second letter of credit to be issued by the defendant New York Trust Company in favor of Altman, Refiners' supplier.

Article 49 of the Uniform Customs and Practice for Commercial Documentary Credits, established by the Seventh Congress of the International Chamber of Commerce provides: "A credit can only be transferred on the express authority of the principal."

Plaintiff contends that the issuance of the second letter of credit by the defendant New York Trust Company to Altman was a nonauthorized transfer of the prime credit opened by the Swedish Bank and confirmed by the New York Trust Company.

Although no decision has come to the attention of the court wherein the term "transfer," as set forth in the Uniform Customs and Practice has been interpreted, an examination of articles written by recognized authorities in the banking field and the testimony of disinterested witnesses establishes that the action by the defendant New York Trust Company in issuing the second letter of credit to Altman was not in conflict with the accepted practice of New York banks (Harfield on Secondary

Uses of Commercial Credits, 44 Col. L. Rev. 899; Ward on Bank Credits and Acceptances, pp. 210–211; Shaterian on Export-Import Banking, pp. 350-352). On the contrary, the issuance of a second credit, commonly referred to as a "back to back" credit, because it involves the same basic transaction as the primary credit, is a device in widespread use today not only by New York banks but by banks throughout the country. As stated by Mr. Wilbert Ward, a recognized authority on bank credits and acceptances: "Many of our banks have declined to undertake such an operation for a beneficiary for whom they would not independently undertake operations, but in so doing they have declined an opportunity to make a double commission on one risk; * * * The one precaution necessary to make the piling up of these subsidiary credits, one on the other, a safe and profitable operation is to procure from each transferor, at the time he requests a transfer, his own invoice at his contract price. The bank has, of course, no right to disturb the relationship of the parties to the various contracts of sale. It must be in a position to present the invoice of the proper seller to each buyer. With these invoices in its possession, the bank is amply protected against any emergency * * * The opening bank and the foreign buyer will, of course, be unaware of the existence of the subsidiary financing." (Ward on Bank Credits and Acceptances, pp. 210–211.)

The feasibility of the issuance of the secondary credits cannot be denied. This method of collateral financing has become even more popular in the tight merchandise market which prevailed during and immediately following World War II (Shaterian on Export-Import Banking, pp. 350–352). An examination of the facts involved in the issuance of the second letter of credit to Altman, therefore, clearly indicates that such transaction was an approved banking practice. It is immaterial that the Swedish Bank was unaware of the existence of this collateral financing. Such is the case in normal "back to back" credit transactions. Each letter of credit, though arising out of the primary contract of sale, is a separate and independent contract (*American Steel Co.* v. *Irving Nat. Bank,* 266 F. 41, *supra*; *Sztejn* v. *Schroder Banking Corp.,* 177 Misc. 719, *supra*). To hold otherwise would, in effect, impair the efficiency of the letter of credit as a means of financing trade and would adversely affect a well-established banking practice and mercantile custom.

The record shows that the defendant New York Trust Company received and transmitted to the Swedish Bank the invoices drawn by the Refiners Export Company as well as all other

documents required by the credit. Nothing else was required to be done by the defendant New York Trust Company at that time. In the absence of a provision in the primary letter of credit, the defendant New York Trust Company was not obliged to and could not properly have been permitted to·go behind the documents in order to examine the quantity, quality, or any other feature of the merchandise purchased by the plaintiff, unless such documents were not genuine on their face or did not conform with the requirements of the letter of credit (*Sztejn* v. *Schroder Banking Corp., supra*; *Laudisi* v. *American Exch. Nat. Bank,* 239 N. Y. 234; *Lamborn* v. *Lake Shore Banking & Trust Co.,* 196 App. Div. 504, affd. 231 N. Y. 616, *supra*). As long as the defendant confirming bank paid out on the letter of credit only on the presentation of the required genuine documents drawn by Refiners Export Company, it cannot be held that it transferred the primary credit opened by the Swedish Bank. The funds used by the defendant New York Trust Company were its own and the debtor-creditor relationship between plaintiff and this bank was never impaired or altered.

The manner in which the entries were made in the internal books of the New York Trust Company at the time of the payment of the secondary credit to Altman is not indicative of any transfer of the Swedish Bank's credit. The defendant's bookkeeping was of no concern to the Swedish Bank, as the premature entries in the New York Trust Company's books, in and of themselves, resulted in no injury or loss to the plaintiff. The Swedish Bank and the defendant New York Trust Company maintained a simple debtor-creditor relationship. The Swedish Bank's legal position was never changed by the erroneous entries in the bank's books which in no way were ever binding on the plaintiff. As long as the defendant New York Trust Company answered to the plaintiff for the correct amount of its indebtedness, no cause of action arose (*S. R. & P. Import Co.* v. *American Union Bank,* 122 Misc. 798). In any event the defendant New York Trust Company's subsequent entries in its internal records indicate that the Swedish Bank was not actually charged for the payments made under the credit to Altman. The Second National Bank of Houston was advised by the New York Trust Company on January 28, 1942, that such payments had been charged against it. The effect of the premature entries in the defendant New York Trust Company's books was to debit the general ledger account for $172,000 and the Swedish Bank's general account for $3,956.32, two days before this defendant was entitled to credit itself with pay-

ments made under the credit of Refiners Export Company. These premature entries were balanced and " washed out " when the Refiners Export Company's credit was actually executed two days later, and no party to either credit transaction was harmed by the internal bookkeeping records of the defendant New York Trust Company.

Plaintiff's contention that the New York Trust Company violated its obligations as its agent by the issuance of the letter of credit and the making of payment thereunder to Altman cannot be sustained. In the opinion of the court, the dual agency rule is not applicable to the instant action. Even though the court has held that a privity of contract existed between the plaintiff and the defendant New York Trust Company, nothing in the transactions involved gave rise to an agency relationship between the parties. As above stated, the contract between a bank and the beneficiary of a letter of credit is completely independent from the credit agreement between the bank and its customer and from the sales contract between the buyer and seller (*American Steel Co.* v. *Irving Nat. Bank, supra*; *Bank of U. S.* v. *Seltzer,* 233 App. Div. 225; *Frey & Sons, Inc.,* v. *E. R. Sherburne Co., supra*; Thayer on Legal Nature of Irrevocable Credits, 36 Col. L. Rev. 1031, 1058). In a transaction involving the issuing bank and the buyer, two contracts often exist between them. Neither of these, however, is contained in the letter of credit. The first contract is the credit agreement itself which necessarily precedes the issuance of a letter of credit. The second contract is concerned with the trust receipt, which necessarily follows the issuance of the letter of credit. The rights and obligations of the parties to the credit agreement are measured only by the terms contained therein (Thayer on Legal Nature of Irrevocable Credits, 36 Col. L. Rev. 1031.)

The agency principle sought to be applied by plaintiff would necessarily disturb a common commercial practice, and courts will not lend their aid in achieving a result which would create turmoil in the business and financial world (*Laudisi* v. *American Exch. Nat. Bank,* 239 N. Y. 234, 242, *supra*; *Sztejn* v. *Schroder Banking Corp., supra*). The mere fact that the bank is a party to both of the contracts does not necessarily create an agency agreement. Once the defendant New York Trust Company issued its letter of credit in accordance with the credit agreement entered into with the plaintiff, the latter, in the absence of any claim as to the lack of the genuineness of the documents presented to the bank by the seller, may not interfere with the

defendant's obligation to carry out the terms of the letter. This banking transaction is entirely divorced from the commercial transaction between buyer and seller, which forms no part of the engagement undertaken by the issuing bank. I hold, therefore, that the relationship of the defendant New York Trust Company to the Swedish Bank was one of independent contractor rather than one of agency (*Shirai* v. *Blum,* 239 N. Y. 172; *O'Meara Co.* v. *National Park Bank,* 239 N. Y. 386; *Sztejn* v. *Schroder Banking Corp., supra*; *Asbury Park & Ocean Grove Bank* v. *National City Bank,* 35 N. Y. S. 2d 985, affd. 268 App. Div. 984; Finkelstein on Legal Aspects of Commercial Letters of Credit, pp. 159–160).

Because of the comparatively novel issues raised by the pleadings and the lack of case material directly in point, rather than treat any of the contentions of the parties summarily, the court, as above set forth, has considered several correlative problems. Plaintiff's action, however, necessarily depends upon whether the transfer of the warehouse receipts was illegal in view of the restriction contained in Order No. M-34.

As above stated, subdivision (d) of the amended Order No. M-34 of the War Production Board provided that " No Producer shall deliver Nitration Grade Toluene to any person, except as may be specifically authorized by the Director of Priorities; * * *." There is no case on record which defines the term " delivery " as contained in such order. Did the restriction of the " delivery " prohibit transfer of title as well as the physical transfer of toluene? That is the crux of the problem presented by the instant action, the answer to which can only be obtained by an examination of the circumstances surrounding the issuance of the order as well as official interpretations of this and various other " M " orders of the War Production Board, which are general preference orders referring to essential war materials.

The imminence of the world conflict in 1941 need not be discussed at any length herein. It is sufficient to note that the Federal Government was concerned with obtaining and preserving certain materials vital to our defense program and the prosecution of the war in Europe. To achieve that end, various restrictive orders were issued by the War Production Board which required special permits by the Director of Priorities before certain materials could be dealt in. On June 26, 1941, Order No. M-22 was issued which related to raw silk. Such order contained a similar restriction as that in Order M-34, and

provided: "(b) No person shall hereafter make delivery, and no person shall accept delivery, of raw silk unless specifically authorized by the Director of Priorities."

On August 26, 1941, the Office of Production Management published an interpretation of the above restrictive provision contained in Order M-22. The official interpretation states that such order " Prohibits the *physical* delivery of Raw Silk from one person to another or. from one location to another, *but does not prohibit changes of title by transfers of negotiable warehouse receipts* for Raw Silk, provided no change takes place in the custody, possession, or location of such Raw Silk." Prior to an amendment of Order M-22, which significantly, specifically prohibited transfer of title to raw silk (6 Federal Register 5290), a Federal Circuit Court of Appeals held that Order M-22 did not render illegal the performance of contracts calling for the delivery of title documents (*Crowley* v. *Commodity Exch., Inc.*, 141 F. 2d 182; see, also, *Matter of Gunze Silk Corp.* [*Rudolph Corp.*], 266 App. Div. 541).

Contrary to plaintiff's contention, the interpretation of Order M-22 is entirely relevant to the issue raised by Order M-34. The purpose of all the restrictive " M " orders is the same, namely, to conserve the vital materials. so as to enable the government to direct their distribution into essential war industries. It is logical to assume, therefore, that the government was primarily interested in knowing the whereabouts of these vital materials rather than their actual owner; hence the restriction on their physical transfer. The Government agencies concerned with the war effort must be deemed to have been aware of the fact that the exigencies of war production would require many industries to purchase their estimated requirements of vital materials far in advance of their actual use and needs. It is obvious, therefore, that many such purchases would necessarily be financed by some credit transaction which might involve transfers of title. Many of the " M " orders, therefore, contain no specific restrictions on the transfers of title. Order M-6-a, issued on September 30, 1941, relating to primary nickel provides that " No *deliveries* of nickel may be made * * *." (6 Federal Register 5006.) Order No. M-10, issued on June 9, 1941, relating to polyvinyl chloride provides " No Producer shall * * * *deliver* any polyvinyl chloride " (6 Federal Register 2838). Order No. M-13, issued on June 9, 1941, relating to synthetic rubber, provides in paragraph (b) that " No Producer shall * * * (1) *deliver* any Synthetic

Rubber '' (6 Federal Register 2838). Order No. M-17, issued on August 4, 1941 (6 Federal Register 3920) relating to pig iron and which was subsequently amended on March 28, 1942 (7 Federal Register 2449), provides, at paragraph (1) of subdivision (f), that '' No Producer shall *deliver* or use pig iron and no person shall *accept delivery* thereof * * *.'' (Emphasis supplied.) Similar restrictions on delivery are contained in Orders Nos. M-20a (6 Federal Register 6144), M-39 (6 Federal Register 5621), M-40 (6 Federal Register 5291), M-46 (6 Federal Register 5534), M-61 (7 Federal Register 1064) and M-84 (7 Federal Register 1128).

In such cases where the Government felt that restrictions on the transfer of title as well as on delivery were required in order to protect its interest in the particular product involved, the '' M '' Order specifically contained such provisions. For example, Order No. M-51, issued on December 13, 1941, relating to bristles, provided, at subdivision (c) thereof, that '' No person shall hereafter sell, deliver, *or transfer title to,* and no person, other than the Defense Supplies Corporation, shall buy, *take title to,* or accept delivery of bristles except upon defense orders, unless specifically authorized by the Director of Priorities * * *.'' (6 Federal Register 6425). It required a specific amendment to such order to delete the reference to the transfer of title (Amendment, dated July 7, 1943, 8 Federal Register 9325). Likewise, Order No. M-70, issued on February 27, 1942, relating to jute, provided in subdivision (d) that '' Unless specifically authorized by the Director of Industry Operations, no person shall hereafter sell, *transfer his title to,* or deliver any raw jute, except to a processor, or a person importing such raw jute. No person, except a processor or a person importing such raw jute, shall hereafter purchase or accept delivery of, or *a transfer of title to,* any raw jute, unless specifically authorized by the Director of Industry Operations (7 Federal Register 1594). Similar specific restrictions on transfers of title were contained in Orders Nos. M-82 (7 Federal Register 521), M-85 (7 Federal Register 784) and M-125 (7 Federal Register 2709).

It is to be noted that subdivision (f) of Order M-34 itself provided that after February 1, 1942, '' No Toluene may be *sold or delivered* for use, or used by any person as a diluent for protective coatings.'' (6 Federal Register 6853.) Paul J. Eisenhuth, Administrator of the Toluene Order, testified that he was not concerned with '' the passage of title to toluene which might be stored within the United States, but rather

with the physical location of the toluene and what became of it on its end use.'' Thus, the very terms of M-34, as opposed to many other restrictive orders, as above cited, did not contain any specific prohibition against transfer of title. The sole requirement of this order was that a permit be obtained from the Director of the Office of Production Management before the toluene could be *physically* transferred from the warehouse where it was held under the warehouse receipts involved in this action. I hold, therefore, that the defendant New York Trust Company did not engage in any action which was illegal under the applicable regulations of the United States insofar as the transaction which involved the nine warehouse receipts is concerned.

In view of the court's holding that the defendant New York Trust Company was an independent contractor and not the agent of the plaintiff and that the transfer of the warehouse receipts did not violate Order M-34, the issue concerning the alleged warranties given by this defendant and by the defendant Manufacturers Trust Company by virtue of its indorsement of the warehouse receipts is purely academic. In any event, article 11 of the '' Uniform Customs & Practice for Commercial Documentary Credits,'' which the plaintiff has conceded is applicable to the transaction involved, provides: '' Banks assume no liability or responsibility for the form, sufficiency, correctness, genuineness, falsification or legal effect of any documents or papers, or for the description, quantity, weight, quality, condition, packing, delivery or value of goods represented thereby, or for the general and/or particular condition stipulated in the documents, or for the good faith or acts of the consigner, or any other person whomsoever, or for the solvency, standing, etc., of the carriers or insurers of the goods.''

No New York case has been found by the court where the question has been litigated as to whether a confirming bank, in a letter of credit transaction, gives any warranties under sections 128–130 of the General Business Law. It has been held, however, under sections 221–223 of the Personal Property Law, which relate to bills of lading, and which are almost identical with sections 128–130 of the General Business Law relating to warehouse receipts, that a bank which accepts bills of lading as security for the payment of drafts does not give any warranties such as mentioned in section 221 of the Personal Property Law (*Archibald & Lewis Co.* v. *Banque Internationale de Commerce,* 216 App. Div. 322; *Jacobs* v. *Banque Pour Le Commerce,* 131 Misc. 162). The court is inclined to adopt a similar

ruling in the instant action with respect to plaintiff's contention as to the alleged warranties referred to in section 128 of the General Business Law. To hold otherwise would compel a bank to scrutinize the documents presented to it in such a manner as to require such bank to go behind the documents themselves. In the opinion of the court, this would be a most unfortunate interference with business transactions (*Sztejn* v. *Schroder Banking Corp., supra*). In any event, it should be noted that subdivision (d) of Order M-34, in addition to restricting physical delivery of toluene, also provided that '' No person shall *accept* delivery of Nitration Grade Toluene in violation of the foregoing clause.'' (6 Federal Register 6853.) Assuming, *arguendo,* that the defendants gave warranties in connection with the transactions involving the warehouse receipts, the plaintiff, who was doing business in this country and, therefore, must be deemed to have had equal knowledge of the government's restrictive orders, cannot claim to have relied upon such warranties (*Federal Crop Ins. Corp.* v. *Merrill,* 332 U. S. 380; *Guaranty Trust Co.* v. *United States,* 304 U. S. 126, 136; *Queensboro Nat. Bank* v. *Kelly,* 48 F. 2d 574; *Studer* v. *Bleistein,* 115 N. Y. 316; *Gass* v. *Wetmore,* 238 App. Div. 398, affd. 264 N. Y. 663). Plaintiff's knowledge of the restrictions negatives any implication of the alleged warranties.

Judgment is rendered for defendants.