CNA MORTGAGE INVESTORS, LTD.,
Plaintiff-Appellee,

v.

HAMILTON NATIONAL BANK,
Defendant-Appellant,

and

Venturi International, Inc.,
Intervening-Defendant.

Court of Appeals of Tennessee,
Eastern Section.

Nov. 25, 1975.

Certiorari Denied by Supreme Court
June 1, 1976.

Sam F. Fowler, Jr., John H. Fowler, Knoxville, for appellants.

John M. Kamins, Detroit, Mich., Foster D. Arnett, Knoxville, for appellee.

## OPINION

GODDARD, Judge.

Hamilton National Bank, Defendant-Appellant, appeals an order granting summary judgment in favor of CNA Mortgage Investors, LTD., Plaintiff-Appellee, in connection with two irrevocable letters of credit issued by the Bank to CNA on the account of Venturi International, Inc. The Bank assigns two errors:

1. Numerous material issues of fact were placed in controversy by the pleadings, exhibits, and affidavits filed in this cause, and it was error for the Chancellor to grant Summary Judgment in favor of the Plaintiff CNA.

2. It was error for the Chancellor to refuse to allow Venturi to intervene in this suit as a matter of right under Rule 24.01 or by permission under Rule 24.02.

The Chancellor entered a well-written and well-reasoned memorandum opinion which, insofar as it relates to assignment of error number one, we adopt as the opinion of this Court.

"In this case Plaintiff CNA Mortgage Investors, LTD brought suit against Hamilton National Bank to enforce payment of two letters of credit issued by Defendant bank in the respective amounts of $37,-500.00 and $34,000.00. By answer Defendant bank admitted that it had refused to pay the sight drafts issued by Plaintiff against the letters of credit and denied that Plaintiffs were entitled to payment.

"By agreed order Venturi International Inc. was permitted to intervene as a Defendant without Plaintiff waiving any objections thereto. Intervening Defendant Venturi filed an answer generally pleading the underlying facts and circumstances which brought about the issuance of the letters of credit and contending that Plaintiff was not entitled to be paid upon them. Plaintiff CNA filed a motion to dismiss Venturi's petition to intervene. Later Venturi filed an amended answer stating its claim with more detail. Following argument, Plaintiff's motion to dismiss as to Venturi was overruled without prejudice to renew its motion later. Plaintiff CNA thereafter filed another motion seeking to dismiss the petition of Venturi because it had no standing to intervene and for summary judgment against Defendant Hamilton National Bank because there is no genuine issue as to any material fact so as to entitle CNA to judgment as a matter of law. Venturi then moved as an alternative to its petition to intervene as a matter of right to be allowed to intervene by permission. Venturi also filed the affidavits of Adrian E. Ford a vice president of Defendant Bank and of Melvin T. Goldberger co-chairman of the board of Defendant Venturi in opposition to Plaintiff's motion to dismiss and for summary judgment. The mo-

tions of the parties were then brought on for argument and are here decided.

"The facts upon which the motions must be decided are based upon the pleadings, exhibits, answers to interrogatories, answers to requests for admissions, and affidavits on file. It appears that Venturi had engaged in negotiations with Plaintiff CNA for two loans in connection with a property to be developed in Boca Raton, Florida. Venturi sought an 18 month first mortgage construction loan from CNA in the amount of $6,800,000.00, and a 24 month standby commitment for a land purchase loan in the amount of $7,550,000.00. Each of the proposed loans called for Venturi to make an application deposit with CNA. The first in the amount of $34,000.00 and the second in the amount of $37,750.00.

"Venturi's co-chairman of the board, Melvin T. Goldberger, signed two 'Loan Applications' for Venturi on June 28, 1973. Plaintiff CNA and Venturi both admitted during argument that these loan applications had been executed and were in the typewritten form as set forth in Exhibits E and F attached to Plaintiff's complaint, except that there had been certain penned in changes in the applications. The parties agreed that the changes in Exhibits E and F having been initialed by both parties were part of the agreement. However, there was a dispute over certain changes shown on the copies of the applications attached to Venturi's pleadings. Venturi claimed they were part of the applications, and CNA claimed they were not because they were not initialed. Be that as it may, the decision here made is not affected by whether or not any disputed changes are deemed part of the loan applications.

"The two letters of credit were issued on the same date as the Loan Applications, June 28, 1973. Both of them were irrevocable. The significant words of the letters of credit read as follows:

We hereby authorize you to value on the Hamilton National Bank of Knoxville, Tennessee for account of Venturi, International, Inc. up to the aggregate amount of [$34,000.00 in one case and

$37,750.00 in the other] available by your draft(s) at sight for and <u>in accordance with the terms of the Loan Application dated June 28, 1973, between the parties attached hereto and becoming a part of this letter of credit.</u> This letter of credit will expire September 28, 1973. * * * Except as otherwise expressly stated herein this credit is subject to the Uniform Customs and Practice for commercial documentary credits fixed by the Thirteenth Congress of the International Chamber of Commerce. (1962 revision) Brochure No. 222. (Underlining supplied.)

Despite the above underlined statement in each letter of credit referring to the attached loan application, there was no loan application attached to either letter of credit when issued by the Bank.

"Plaintiff CNA thereafter issued its sight draft in the applicable amount for each letter of credit. When the sight drafts arrived at Defendant Bank, it refused to pay them because (1) the loan application was not attached to the letter of credit and (2) Venturi had advised CNA had not met the conditions required to receive payment. Specifically the Bank gave its reasons for dishonor as follows:

Returned 9/13/73 because Loan Application dated June 28, 1973, did not accompany this letter of credit. Also, Venturi International, Inc., advises that CNA Mortgage Investors, LTD., has not satisfied the prerequisite conditions to draw on this letter of credit.

All parties have agreed in argument that Defendant Bank is bound by the reasons it gave for dishonor and cannot now rely on any different reasons.

"Plaintiff contends that under letter of credit law Defendant Bank must pay the letters of credit based upon the documents before the Court. Venturi and Bank claim that the loan applications were made part of the letters of credit by reference and therefore the underlying transaction may be considered in determining whether the Bank is bound to pay. Because of this Venturi also says there are issues common to Plaintiff's claim against the bank and Venturi's rights against the Bank so that it should be permitted to intervene.

"The questions raised should be decided prior to trial, if reasonably possible, because it appears that witnesses at great distances from Knoxville may be required to testify if the underlying transaction is to be considered. It would be a disservice to the parties and the witnesses to permit the parties to go to the great expense of preparing for trial should it be decided that the documents before the Court do not permit the introduction of proofs on the underlying transaction.

■ "A letter of credit is basically a device for making payment in commercial transactions upon presentation to the issuing bank of certain documents specified in the letter of credit. In merchandise sales the device permits the seller to arrange for payment against documents. For example, upon presentation of the seller's sight draft and a bill of lading showing delivery of the merchandise together with any other documents required by the letter of credit, the issuing bank will forthwith pay the seller. The device is much used in foreign trade so that payment will be paid upon delivery of the goods even though the buyer may raise some objection to the goods. It is the delivery of documents to the bank, and nothing about the validity of the underlying transaction that controls payment by the bank. In their discussion of letter of credit law *White and Summers* say:

But if the presented documents comply then buyer's issuing bank must pay, and this is generally true even if buyer, thinking he has hot news that a shipment is unconforming, instructs his bank not to pay drafts presented by seller's agent. *White and Summers, Handbook of the Law under the U.C.C.* page 604.

The duties of a bank under a letter of credit are created by the document itself, and the bank has no discretion not granted therein. *Talbot v. Bank of Hendersonville* (Tenn. App.1972; cert. den.) 495 S.W.2d 548, 556.

"The undisputed facts in this case disclose that the payment of the letters of credit by

their own terms was to be made upon the sight draft of Plaintiff CNA and in accordance with the loan applications attached to the letters of credit. The sight drafts were presented. Thus the problem in this case is whether or not there is anything about the wording in the letters of credit that creates an issue of fact requiring the presentation of proofs to resolve. For the purpose of deciding the motions the letters of credit will be deemed to incorporate all of the terms of the loan applications both with and without all changes marked therein. Defendants base their position upon the contention that the underlying transaction controls the obligation of the bank to pay because the terms of the loan applications are part of the letters of credit by reference.

■ "The Bank's first ground for dishonoring the letters of credit was the failure to attach the loan applications to the sight drafts. Counsel for Defendants stated at argument, although the pleadings do not show, that the loan applications were not attached to the letters of credit issued by the bank because the parties were to attach them later. Whatever the reason, the bank issued the letters of credit without the applications attached although reciting otherwise. Under such circumstances the Bank is not in a position to complain that the beneficiary of the letters also failed to attach the loan applications to its sight drafts. By reciting that in the letters of credit that the loan applications were attached when they were not, the Bank set the standard for the transaction and evidenced its willingness to act at its peril insofar as any prerequisites for payment might be contained in the loan applications. Further, the most that can be said for failure to attach the applications is that it left the Bank in doubt as to what might be required in order to pay the letters, but does not itself constitute a ground for non-payment. In any event the motions are being considered upon the assumption that the terms of the applications were part of the letters, so the effect of the failure to attach makes no real difference. It is concluded that the first reason given by the bank for dishonor is without merit and raises no genuine issue of fact that would affect the outcome of the case.

"The second ground for dishonor given by the Bank is the alleged failure of Plaintiff CNA to satisfy the prerequisite conditions to draw on the letters of credit. This reason for dishonor states a ground, which if valid, would permit the introduction of proofs of the underlying transaction, and requires further consideration of the law . governing letters of credit.

■ "Letters of credit are primarily contractual in nature and can thus generally be varied from the provisions contemplated by the Uniform Commercial Code. However, there is some limitation upon such variation. It is provided in T.C.A. § 47–5–114(1) that:

> An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract for sale or other contract between the customer and the beneficiary.

This provision providing for the non-variability of the obligation to pay in accord with the terms of the credit is discussed by *White and Summers* :

> The nonvariability of section 5–114(1) follows from the very nature of an irrevocable letter of credit; one of the basic purposes for which such letters are issued is to eliminate the risk to the beneficiary that the customer will refuse or halt payment because of alleged deficiencies in the beneficiary's performance. (Of course, the parties could choose to issue a revocable credit.) *White and Summers, Handbook of Law under the Uniform Commercial Code* (1972) page 616.

After this statement, the authors go on to recognize that other provisions of the Code may be varied by agreement, saying:

> Beyond the foregoing formal and substantive Article Five provisions, we believe that the parties may by agreement vary any of the other sections of Article Five. Indeed, no fewer than fifteen sub-

sections specifically include the phrase 'unless otherwise agreed.' The general principle of freedom of contract reigns in Article Five. Ibid.

It is concluded that the terms of the letter of credit control. The documents are supreme. Usually they require payment upon presentation of documents. However, if they require that the underlying transaction be considered, then such proofs should be admitted. Defendants have cited a number of cases that recognize that where a letter of credit so provides it may incorporate the underlying transaction. *Kingdom of Sweden v. New York Trust Co.*, 197 Misc. 431, 96 N.Y.S.2d 779, 790 (1949); *Sztejn v. J. Henry Schroder Banking Corp.*, 177 Misc. 719, 721, 31 N.Y.S.2d 631, 633-4 (1942); *Consolidated Sales Co. v. Bank of Hampton Roads*, 193 Va. 307, 68 S.E.2d 652, 658 (1952); *E. E. Huber & Co. v. Lalley Light Corp.*, 242 Mich. 171, 218 N.W. 793, 794 (1928). The effect of all of this in this case is that, if the letters require that the underlying transaction be considered, the summary judgment must be denied. However, if the documents construed most favorably to Defendants do not call for consideration of the underlying transaction, there is no factual issue to be decided and the summary judgment must be granted.

"Turning to the loan applications it appears that most of the provisions of the loan applications have to do with Venturi's obligations under the commitments it was seeking from CNA and do not purport to deal with what was required to cause payment of the letters of credit. There are also some provisions that deal with the type of loans that CNA was to obligate itself to make, and none of these provisions have anything to do with the requirements for payment of the letters of credit.

"The only loan application provision which appears to have a possible bearing on the question is the paragraph in each application entitled: 'Application Deposit.' That paragraph states:

APPLICATION DEPOSIT

L/C

A cash deposit of $ [$37,500.00] [$34,-000.00] payable to CNA Mortgage Investors Limited is enclosed herewith. In the event a commitment is issued by CNA Mortgage Investors Limited on the foregoing terms, or upon any other accepted terms, the deposit this date paid shall apply against CNA Mortgage Investors Limited loan charges. If this loan is not closed due to cause not the fault of CNA Mortgage Investors Limited, the deposit mentioned above shall be retained by CNA Mortgage Investors Limited as liquidated damages and not as a penalty.

As can be seen this paragraph first provides that a deposit is enclosed with the application; next, it provides that if the commitment is issued by CNA, the deposit will apply against loan charges; and finally, it says that if the loan is not closed not due CNA's fault CNA may retain the deposit as liquidated damages. There is nothing in these provisions connecting the letters of credit to the underlying transaction. There is no statement that, if no commitment is made, the deposit is not to be made, nor that the letters of credit are not to be honored. Had they intended, the parties could have arranged to have the letters of credit read something like this: 'This letter to be paid upon presentation of a copy of CNA's loan commitment for $_____ to Venturi.' The thrust of the language used is that a deposit in some form is a precondition to the application, and disposition of the deposit is provided for in two circumstances having nothing to do with letters of credit. There is nothing further. The typed language does require forwarding of the deposit in money with the application, and the parties changed this by crossing out the term 'cash' and inserting the term 'L/C.' But there is nothing in this change which incorporates the underlying transaction to the letters of credit.

■ "Considering all of the documents, the tenor of the letters of credit is that they are to be paid upon presentation of a sight

draft and nothing further is required by virtue of considering the loan applications part of the letters. There is no specific requirement that anything documentary or otherwise be presented to the Bank except sight drafts. In view of the documentary nature of letters of credit, very clear language would be necessary to require that something more than the presentation of specified documents is needed for payment. If the rule were otherwise, the usefulness of the letters of credit would be severely diminished and the great advantage of making payment against documents in business transactions would be lost. The cases cited by Defendants recognizing that a letter of credit can incorporate the underlying transaction do not actually find in these cases that it is incorporated. It is concluded that on the face of the documents the Bank is obligated to pay the letters of credit, and evidence of the underlying transaction is not relevant or admissible.

.　　.　　.　　.　　.

"So that there will be no misunderstanding of this decision no finding as to the obligations between Venturi and CNA is made. This decision is limited to the narrow question as to whether or not the Bank must pay the letters of credit."

The Bank concedes that if the summary judgment is sustained, its second assignment of error need not be considered.

Accordingly, the assignments of error are overruled and the Trial Court affirmed. The costs of the cause are taxed to the Bank.

PARROTT, P. J. (E.S.), and SANDERS, J., concur.