HAROLD N. SHELDON AND RETHA M. SHELDON, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5550–71. Filed April 25, 1974.

*Fenton Williamson, Jr.*, and *James O. Demsey*, for the petitioners. *Joyce E. Britt*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' income tax for 1965 through 1969 as follows:

| Year | Amount | Year | Amount |
| --- | --- | --- | --- |
| 1965 | $1, 739. 12 | 1968 | $1, 945. 00 |
| 1966 | 2, 434. 30 | 1969 | 3, 752. 00 |
| 1967 | 2, 935. 55 | | |

The issue is whether petitioners properly excluded from their gross income, as defined in section 61, I.R.C. 1954, amounts received by the Porterville Church of the Nazarene from the marketing of their cotton by a cooperative marketing association. The answer depends on whether petitioners made gifts to the church of bales of cotton as such or the sales proceeds attributable to those bales.

FINDINGS OF FACT

Petitioners Harold N. and Retha M. Sheldon, husband and wife, were legal residents of Strathmore, Calif., at the time they filed their petition. They filed their joint income tax returns for 1965, 1966, and 1967 with the district director of internal revenue at San Francisco and for 1968 and 1969 with the Western Service Center, Ogden, Utah. In maintaining their records and filing their returns, petitioners used the cash method of accounting. Most of their business activities were handled by Harold N. Sheldon, and he will be referred to herein as petitioner.

During the period in controversy, petitioner owned and operated a 700-acre farm on which he raised various crops, including cotton, and in computing his income tax for each year he deducted his expenses pertaining to all the cotton produced that year. He had the cotton ginned and processed through the Tule River Cooperative Gins, Inc. (the gin), at Woodville, Calif. He marketed the cotton through Calcot, Ltd. (Calcot), a nonprofit cooperative association of which he was a member.

Calcot was organized and is operated under the provisions of the Agricultural Code of the State of California for the purpose of mar-

keting cotton, cottonseed, and other cotton products of its members. Its principal office and its storage facilities are located in Bakersfield, Calif.

On November 18, 1950, petitioner and Calcot executed a contract entitled "Marketing Agreement," which was in effect during the years in controversy. The pertinent provisions of the contract, which refers to Calcot as "the Association," include the following:

1. That during the life of this agreement the Association agrees to receive and the Grower agrees to deliver to the Association all cotton produced by or for him, or as much thereof as he may control.

\* \* \* \* \* \* \*

3. (a) The Grower hereby appoints the Association his agent for the purpose of handling and marketing his cotton according to the most practicable method as determined by the Association.

(b) The Association shall make rules and regulations with respect to the classing, grading, financing, shipping, pooling and selling cotton as well as with respect to accounting to the Grower for the proceeds from the sale of cotton, less deductions hereinafter specified. The grading and classing of cotton by the Association shall be conclusive as between the parties hereto. Pools may be established, altered, or discontinued at any time by direction of the Board of Directors of the Association.

(c) The Association is hereby authorized to affiliate and contract with such marketing or other agencies as the said Board of Directors shall determine.

4. *Title to cotton shall pass from the Grower to the Association upon its delivery to the Association* [sic]. The Association may borrow such sums of money on the security of cotton or other assets as the Board of Directors shall deem necessary or advisable. [Emphasis supplied.]

5. The Association shall market the cotton delivered by the Grower and there shall be deducted from the proceeds of sale thereof the cost of freight, insurance, storage, and any other expense incurred in handling cotton, including all costs of operating and maintaining the Association together with retains for the Association Revolving Fund and other fund or funds provided for in the Association's by-laws. Such retains shall in no event be less than one per cent of the gross sale price of the cotton delivered hereunder.

\* \* \* \* \* \* \*

8. This agreement shall be governed by and subject to all the provisions of the Articles of Incorporation and By-Laws of the Association and any amendments or revisions thereof.

Calcot's "By-Laws" contain the following pertinent provisions:

Section 2.01. QUALIFICATIONS FOR MEMBERSHIP. Any person engaged in the production of products shall be eligible to membership in Association. The word "person", as used in this Article includes individuals, firms, partnerships, corporations, and associations; and also, lessees and tenants of lands used for or in the production of products, and any lessor or landlord who receives as rent all or part of the products raised on leased premises.

A cooperative association as defined by the Act of Congress known as the Agricultural Marketing Act (12 United States Code, Section 1141 [j] [a]) shall be

eligible for membership in the Association. The Association shall be eligible to be a member of another cooperative association organized under the provisions of the Cooperative Act of California, or under the laws of any other state.

\* \* \* \* \* \* \*

Section 2.07. MEMBER TO FILE AGREEMENT. Each member shall execute and file with Association an agreement to market products through the facilities of the Association, and containing such other provisions and being in such form as the Board shall prescribe.

Such agreement may be combined with and incorporated in the application for membership, and, in such case, acceptance of the application shall be deemed approval and execution of the agreement by Association and shall make the agreement immediately effective and binding upon the applicant (member) and Association.

\* \* \* \* \* \* \*

The agreements with members need not be uniform in all respects. Variations in terms of contracts with members shall be based on the difference of type of patronage of the Association's facilities with the members. In no event shall any such contract with a member obligate or permit the Association to operate otherwise than a non-profit cooperative association.

\* \* \* \* \* \* \*

Section 10.07. HYPOTHECATE PROPERTY. To mortgage, pledge, assign, hypothecate or otherwise alienate, as security for any Association indebtedness, any products, warehouse receipts, bills of lading, or other evidence of ownership or right of possession of any products received by the Association for marketing, and also the proceeds and moneys owing to the Association from the sale of any products, or otherwise; and also any credits, shares of stock or certificates, under any Revolving Fund agreement or agreements, between the Association and other cooperatives, or marketing, or by-product or supply companies; provided, however, the Association shall account to those entitled thereto for the value of any products, or proceeds therefrom, or Revolving Fund Credits or interest in the event of any loss to the Association from any encumbrance created or suffered by the Association.

Section 10.08. COMMINGLE MONEYS. To commingle with its own funds, and use, all proceeds of products, and *no member shall be entitled to claim or be paid the specific proceeds from the sale of any specific products under any trust doctrine, or otherwise; but the members shall become general creditors of the Association for any amounts payable to them.* [Emphasis supplied.]

\* \* \* \* \* \* \*

Section 10.13. ADVANCE TO MEMBERS. To make advances to members against the products to be marketed by the Association, or its proceeds; and the provisions of Section 823 of the Corporation Code of California shall not be applicable to the Association, or its business; and loans and advances may be made to members (whether Directors, officers, or others) and obligations guaranteed without any officer or Director incurring any liability on account thereof; and members subscribing or assenting to these By-Laws shall be deemed to have given their continuing assent to such loans and guarantees.

Section 10.14. TIME OF SETTLEMENT FOR PRODUCTS. To determine the time or times when the net proceeds returnable to the members shall be paid.

Payment may be made at one time or from time to time in installments as the Board shall determine. Members shall be treated uniformly, and the same proportionate part of the net proceeds returnable to the members shall become payable at the same time. No member shall have any right to require or enforce payment of any net proceeds returnable to him unless and until the Board shall have determined the same to be generally payable.

The processing of petitioners' cotton during the years in issue followed the normal procedures outlined below.

Shortly prior to the ginning season, Calcot sends to each of its members a form in triplicate entitled "Authorization From Member for Handling Cotton." This document gives Calcot authority to place in a marketing pool all cotton delivered by the member and to pledge the cotton (if eligible) to the Commodity Credit Corporation as security for any amount loaned by that corporation to Calcot. The form identifies the farm on which the cotton was produced and is signed in triplicate and returned to Calcot by the producer-member. Calcot sends one copy to the producer-member, sends one copy to the gin, and retains the original for its files.

Petitioners and other growers in the area harvest their cotton in the fall of the year, beginning in October. The cotton is transported to the gin in trailers, where the seed is removed and the lint cotton is compressed into bales weighing approximately 500 pounds each. The gin begins its records on the grower's unginned cotton by using numbered "trailer tags" as delivery receipts. These tags, when completed, show the name and location of the grower; the weight of the unginned cotton; the weight of, and the number assigned by the gin (gin number) to, each bale ginned from the trailer load; and certain other information.

A numbered "Negotiable Yard Receipt Original," often referred to as a bale receipt, is prepared and issued for each bale. This instrument is evidence of the ownership of the bale to which it relates. It states that the gin has received a bale of cotton for the account of the grower "or bearer" and that the bale is held subject to the order of the holder of the original bale receipt. The bale receipt also reflects the gin number of the bale, the weight of the bale, and the ginning and other charges against it, and bears the certification of a public weightmaster and the signature of an authorized agent of the gin.

In the case of cotton owned by growers who are not members of Calcot, the bale receipt is required to be surrendered to the gin when the bale is removed from the gin's storage yards. As to the bales belonging to Calcot members, the gin keeps these bale receipts in a separate file. When the bales are transferred to Calcot, the gin receives a trucker's acknowledgment listing the bales picked up, and the bale receipts are placed in another file and are ultimately destroyed.

In the normal course of ginning the cotton, the gin takes samples from each bale, identifies the bale by the gin number, and sends the samples to the Cotton Classing Office of the United States Department of Agriculture (Cotton Classing Office) for grading as to quality, micronaire reading, and staple length. Within a period of approximately 2 weeks, the Cotton Classing Office forwards directly to Calcot bale class cards indicating the gin bale number, the grower's name, and the various grade specifications for each bale.

The gin sends the original completed copy of the trailer tag together with corresponding bale receipt numbers and a transmittal card to Calcot. Upon the receipt of the original trailer tag, Calcot normally directs its trucks to pick up from the gin yard the bales of cotton described in the trailer tag and deliver such bales to its storage facilities in Bakersfield, Calif. The timespan between delivery of the unginned cotton to the gin and the receipt of the bales of ginned cotton by Calcot, including the ginning and baling process, is usually 6 to 8 days.

When Calcot picks up the bales at the gin, they are transported to the Calcot Compress and Warehouse (Calcot compress or yards) which is owned by Calcot. Once the cotton is delivered to the Calcot yards, it is commingled with other cotton, and the members have no further control over it.

At the Calcot compress, each bale is tagged with a compress number which corresponds with the number on a "Negotiable Public Warehouse Receipt" (warehouse receipt) prepared for that bale. This receipt is held in suspense until Calcot receives the classification information on the cotton from the Cotton Classing Office, and when that information is received, it is recorded. The completed warehouse receipt reflects, in addition to the grade and staple of the cotton, the gin from which the bale was received, the gin bale number, the condition in which it arrived at the compress, the date of its arrival, and its gross weight. At this point the bale is available to be applied on a sale by Calcot regardless of whether the grower has invoiced the cotton to Calcot. The warehouse receipts are negotiable, and the compress cannot move the bale until the warehouse receipt for it is surrendered.

From the information on the trailer tags received from the gin and the bale class cards received from the Cotton Classing Office, Calcot prepares machine punch cards for each bale of cotton on which it receives the classing data. This type of cards is known as an "In-Lieu Class Card" (in-lieu card). These in-lieu cards, which bear the grower's name, are then forwarded to the gin by Calcot.

Periodically, at the grower's direction, the gin makes up an invoice card for a Calcot member, attaches the appropriate in-lieu cards to

each such invoice card, and sends the invoice card to Calcot. Upon receipt of the invoice card, Calcot establishes an account in the name of the member whose cotton is described in the invoice and in-lieu cards, and prepares a grower's "outturn" for the account. At this point the grower-member may receive an advance against his cotton, computed in the manner described below. The outturn reflects the name of the grower, the bale number, the grading information, the price used by Calcot in making advances against the cotton, the weight of the bale, the amount of the advance, and other pertinent information.

Early in the season, in August of each of the years in issue, Calcot's board of directors decides the rate on which advances will be made to the members for cotton of various staples and grades. The rate of the advances is based on an estimate of cotton prices for the coming season. As soon as the cotton is ginned and is graded by the Cotton Classing Office, the member may have an invoice card submitted and receive an advance payment. Such an advance is not unconditional but is merely a loan against the proceeds ultimately payable on the cotton from the marketing pool. If he chooses to do so, the member may enter into a "Deferred Payment Contract." That contract provides that "the Grower by declaring his intentions on each invoice form prescribed by Calcot" may defer receiving payment for "the cotton covered by that invoice" until the subsequent year.

Calcot is staffed by experts in the sale of cotton, and they decide, without consulting the grower-members, when and on what terms the cotton in the Calcot marketing pool will be sold. Beginning with the receipt of cotton from the gins in October, Calcot sells the cotton pursuant to orders from purchasers, usually in lots of 100 bales, according to grade and staple. A grower's cotton does not move in a single lot. One sale may include bales from a number of growers. Calcot sells cotton from its warehouse all year long. Some bales are shipped immediately. Others remain in the warehouse until the buyer requests delivery, and in that event the purchaser pays Calcot for the storage.

On or about June 30 of each year, Calcot completes the marketing of the cotton grown and ginned during the preceding calendar year. Final settlement is made with the members shortly thereafter, taking into account Calcot's costs, the advances that have been previously made on the cotton, and the withholdings for a revolving fund, and dividing the remaining proceeds proportionately. Every member is treated alike. No one is guaranteed any particular price for his cotton. Each member takes the average price for the grade and staple of his cotton. No member is permitted to have his cotton sold separately in order that he may settle his account earlier than other members.

Petitioner is a member and officer of the Porterville Church of the Nazarene (the church), and during the years in controversy he made contributions to the church's building program. In early January of each year in issue, he executed a cotton invoice or gave oral instructions to the gin, authorizing the transfer of the designated cotton proceeds to the church. Pursuant to these authorizations, the church received payment from Calcot in the year of each gift. Petitioners deducted the following amounts on their income tax returns as contributions to the church but did not include these moneys in their taxable income:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1965 | $5,730.42 | 1968 | $6,652.00 |
| 1966 | 6,604.99 | 1969 | 8,817.00 |
| 1967 | 7,100.32 | | |

In the notice of deficiency, respondent allowed the deductions but determined that such amounts were includable in petitioners' taxable income.[1]

In making these gifts, petitioners never executed any instruments whereby a portion of their growing or harvested crops of cotton was gifted to the church. Nor did they physically deliver to the church any bales of cotton or instruments of title. The church received only the cash proceeds of harvested cotton as a result of petitioners' gifts.

To enable the church to receive the cash gifts, petitioner instructed the gin to make invoice cards in January of each of the years in issue in the name of the church for a stated number of bales which he had harvested and had ginned. It was the policy of the gin, at the request of the grower, to make such invoice cards and thereby to transfer to anyone else the right to receive the proceeds attributable to the cotton described on such cards. Upon receipt of the invoice cards and the corresponding in-lieu cards, which bore petitioner's name, Calcot established accounts in the name of the church on its books and records. Immediately after these bales had been so invoiced, Calcot issued a "Growers Outturn" for each bale and the advance payments to the church. Neither petitioners nor the church ever had physical possession of the bales of cotton.

Although the church owned no farmland and produced no cotton, on January 6, 1965, it had executed a "Marketing Agreement" with Calcot and was carried on its records as a member. All the cotton

---

[1] The parties have stipulated the amounts received by the church during each of these years. As to 1965, 1966, and 1969, those amounts are the same as the figures in the above table. As to 1967 and 1968, the parties have stipulated that the church received $6,604.99 and $7,100.32, respectively. Although there is no explanation in the record concerning these discrepancies, the discussion herein treats the amounts paid to the church and the amounts deducted as if they were the same.

involved in the gifts by petitioners to the church was ginned and baled prior to the close of the calendar year in which it was produced. The cotton was picked up at the gin yard by Calcot's trucks and transported to Calcot's storage yards prior to the time of the invoicing of the cotton to the church or to any other party.

In each of the calendar years 1964 through 1970, petitioners produced and marketed cotton other than that invoiced to the church. All such cotton produced in a calendar year by petitioners was ginned by the gin and was marketed by Calcot. All such cotton produced by petitioners in a particular calendar year was invoiced in their names by the gin in the year subsequent to its production at the same time and in the same manner as the cotton that was invoiced to the church pursuant to the directions of petitioners. Petitioners deducted the expenses pertaining to the production of all cotton in the year it was harvested. All the cotton so produced in a calendar year and invoiced to petitioners was transported to the yards of Calcot in Bakersfield, Calif., in the year that it was harvested and ginned, and prior to the year in which it was invoiced to petitioners.

Petitioners executed documents entitled "Deferred Payment Contracts" beginning in 1964 and for each of the taxable years in issue. There are reflected as cotton income on the Federal income tax returns of petitioners the proceeds of the sale of cotton received by petitioners each year with respect to cotton invoiced to them in such year, but produced and ginned in the previous taxable year. The amounts so included in the taxable income of petitioners for each year, representing sales of cotton produced in the previous calendar year, are as follows:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1965 | $34, 286. 86 | 1968 | $28, 701. 00 |
| 1966 | 22, 050. 05 | 1969 | 15, 257. 00 |
| 1967 | 20, 046. 37 | 1970 | 10, 139. 00 |

### OPINION

Petitioner contends that he transferred to the church property rights in specific bales of cotton prior to the realization or recognition of any income therefrom and, therefore, is not taxable on the proceeds received by the church. Respondent maintains that, when the gifts were made, petitioner possessed only a contractual right to share ratably in the pooled proceeds of the sale of the cotton grown by all Calcot members. Relying upon the familiar principle that a taxpayer cannot avoid the income tax by assigning his earned income to another person, respondent urges that petitioners must include in their gross

income in each year of payment thereof the proceeds received by the church. *Helvering* v. *Horst*, 311 U.S. 112 (1940).

We hold for respondent.

An operating farmer who donates crops to a charity before he recognizes income from them is not required to include the value of the crops in his income.[2] The farmer has merely assigned to the charity a property asset which has appreciated in value. Neither the harvesting nor the donative transfer of the product of his capital and services is a taxable event. See *Campbell* v. *Prothro*, 209 F. 2d 331 (C.A. 5, 1954) ; *Stuart A. Rogers*, 38 T.C. 785 (1962) ; *White* v. *Brodrick*, 104 F. Supp. 213 (D. Kan. 1952), appeal dismissed per curiam 198 F. 2d 751 (C.A. 10, 1952) ; cf. *Tatum* v. *Commissioner*, 400 F. 2d 242, 246–247 (C.A. 5, 1968), affirming 46 T.C. 736 (1966). The correctness of this principle is not in dispute. However, the petitioner in the instant case did not donate cotton as such when he made his contributions to the church. The marketing of the cotton had already progressed beyond the point where he owned the individual bales of cotton. He possessed only the right to share proportionately in the net proceeds of all the cotton sold by Calcot, and it was a portion of those proceeds that he assigned to the church.

Petitioner's marketing agreement with Calcot, executed when he became a member, was specifically enforceable, Cal. Agric. Code sec. 54263 (West 1968).[3] It obligated him to "deliver to * * * [Calcot] all cotton produced by or for him, or as much thereof as he may control." The agreement expressly provided that : "Title to cotton shall pass from the Grower to * * * [Calcot] upon its delivery to * * * [Calcot]." Prior to the beginning of each ginning season, he had also

---

[2] Had petitioner donated his cotton as such to the church in the year it was harvested, he would not have been required to include its value in his income. However, the regulations would have denied deductions for expenses incurred during that year in growing the donated cotton. Sec. 1.170–1(c)(1), Income Tax Regs. All the taxable years in issue precede the effective date of the amendment to sec. 170(e), I.R.C. 1954, which places certain limits on deductions for contributions of tangible personal property to charitable organizations. See the Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 549.

[3] Cal. Agric. Code (West 1968) :

Sec. 54263. Specific enforcement

Notwithstanding any provisions of the Civil Code, a contract which is entered into by a member or stockholder of an association which provides for the delivery to such association of any product which is produced or acquired by the member or stockholder, may be specifically enforced by the association to secure the delivery to it of such product. (Stats. 1967, c. 15.)

The above section was effective beginning Nov. 8, 1967, by enactment into law of the current Cal. Agric. Code (Stats. 1967, c. 15). Until that date of the years in issue, corresponding sec. 1221 of the repealed Code (West 1954) read as follows :

Sec. 1221. Specific enforcement of marketing contracts

A contract entered into by a member or stockholder of a non-profit cooperative association or corporation, providing for the delivery to such association or corporation of products produced or acquired by the member or stockholder, may be specifically enforced by the association or corporation to secure the delivery to it of such products, any provisions contained in the Civil Code to the contrary notwithstanding. (Stats. 1933, c. 25, p. 264, § 1221.)

executed a document authorizing Calcot to put his cotton into its marketing pool. When petitioner made his gift to the church, his cotton had already been harvested, ginned, and placed in the marketing pool. Calcot proceeded "expeditiously" to market the commingled cotton delivered to it, filling purchase orders from the compress operated by its subsidiary. The cotton was sold according to grade and staple without regard to the member who grew it. Petitioner had no right to direct the timing or the terms of the sale of the cotton he delivered to Calcot but was entitled only to share proportionately in the proceeds of the sale of all the cotton placed in the Calcot marketing pool. By January of the year following the cotton's harvest, petitioner's bales of cotton were beyond recall.[4]

The evidence does not even purport to show when petitioner's cotton was sold. Indeed, the manner in which the cotton was marketed made such proof practically impossible. Calcot was not required to segregate the proceeds from the sale of petitioner's cotton from those derived from the marketing of other members' cotton. Rather, Calcot's bylaws, quoted in part in our Findings, authorize Calcot to commingle with its own funds, and use, all proceeds from the members' products, and the bylaws deny petitioner or any other member the right to claim or be paid the proceeds from the sale of any specific products. The bylaws further state "the members shall become general creditors of * * * [Calcot] for any amounts payable to them."[5]

The factual situation is analogous to that in *Commissioner* v. *Linde*, 213 F. 2d 1 (C.A. 9, 1954), certiorari denied 348 U.S. 871 (1954), where the decedent, the owner of a vineyard, had delivered his grapes to cooperative associations for conversion into wine and sale of the

---

[4] There was some testimony that bales of cotton sent to Calcot could be retrieved, and this testimony is cited as evidence that petitioner still owned the individual bales he purportedly gave to the church. This testimony, however, as we understand it, related to nonmembers' cotton delivered to Calcot by mistake. In any event, as a practical matter, Calcot kept no records on an individual owner's cotton until it was invoiced, and the commingled cotton was often sold within a few days after it was received by Calcot beginning in October. The assembling and return of petitioner's bales of cotton to him in the following January of each year, 2 or 3 months after Calcot had received them, was therefore such an extremely remote and hypothetical possibility as to be disregarded in determining tax liabilities. *Hudspeth* v. *United States*, 471 F. 2d 275, 280 (C.A. 8, 1972).

[5] The marketing agreement recites that: "The Grower hereby appoints * * * [Calcot] his agent for the purpose of handling and marketing his cotton" and, as quoted in the text, the bylaws (sec. 10.08) provide that the members shall become general creditors of Calcot for any amounts payable to them. Respondent points out that the courts have stated that a cooperative marketing pool holds the proceeds from its sales as a trustee for its members. See *California & Hawaiian S. R. Corp.* v. *Commissioner*, 163 F. 2d 531 (C.A. 9, 1947), certiorari denied 332 US. 846 (1948); *Bogardus* v. *Santa Ana Walnut Growers Assn.*, 41 Cal. App. 2d 939, 108 P. 2d 52 (4th Dist. Ct. App. 1940). We think it unimportant for our purposes whether the relationship between Calcot and its members was that of agent-principal, debtor-creditor, or trustee-beneficiary with respect to the cotton sales proceeds. The point is that petitioner had transferred title to the cotton to the cooperative, and at the time he made the gifts to the church all he retained was the right to be paid for his proportionate share of the proceeds from the sale of the cotton in the cooperative's pool.

wine.[6] The liquidation of some of the wine-marketing pools did not occur until 1945, after the decedent's death. Holding that the proceeds received when those pools were completely liquidated in 1945 were income in respect of a decedent within the meaning of the predecessor of section 691 of the Internal Revenue Code of 1954, the court said (p. 4):

The payments which the taxpayer received in 1945 were realized under and in consequence of contracts and deals made by the decedent in his lifetime. No act or thing taken or performed by the taxpayer operated to procure or to give rise to this payment. Such payments had their source exclusively in the decedent's contract and arrangement with the cooperative associations. * * *

The court observed further (p. 7):

After decedent had delivered his grapes to the associations all he had remaining was a right to collect sums of money, the amounts of which awaited the event of marketing. * * *

Similarly, when petitioner made gifts to the church in early January of each year in issue, he did not own specific bales of cotton. He possessed only a right to collect sums of money, the amounts of which awaited the marketing of his cotton. He did not give bales of cotton to his church. He merely assigned to the church a right to collect a portion of the money which he was entitled to receive from the cooperative. The right to share in the proceeds of Calcot's sales represented his earnings from his agricultural pursuits, and he does not escape tax on them by assigning them to the church. The dominant purpose of the revenue laws is the taxation of income to those who earn or otherwise create the right to receive it, and that purpose cannot be escaped by anticipatory arrangements however skillfully devised to prevent the income from vesting even for a second in the donor. *Lucas* v. *Earl*, 281 U.S. 111, 112, 115 (1930); *Kinsey* v. *Commissioner*, 477 F. 2d 1058, 1063 (C.A. 2, 1973), affirming 58 T.C. 259 (1972); *Hudspeth* v. *United States*, 471 F. 2d 275, 279-280 (C.A. 8, 1972); *Williamson* v. *United States*, 155 Ct. Cl. 279, 283-284, 292 F. 2d 524, 527 (1961); cf. *Helvering* v. *Horst*, 311 U.S. at 119 and 120. The assignments to the church do not shield petitioner from tax on the proceeds from his cotton.

Petitioner contends, however, that Calcot was merely his marketing agent and that he retained title to the cotton until it was invoiced to the church. Before his cotton was invoiced, petitioner insists, "delivery" within the meaning of the marketing agreement, quoted in part in our Findings, had not been completed. On this ground, he contends that he still had equitable ownership of the cotton when he caused individual bales to be invoiced to the church.

[6] Cf. Lyon & Eustice, "Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case," 17 Tax L. Rev. 295, 379-386 (1962).

The record does not support petitioner's interpretation of the invoicing procedures. The assistant manager of the gin testified that the "Cotton Invoice" was used as the transfer document for cotton which is sold to "outside buyers," i.e., someone other than Calcot. With respect to cotton sold through Calcot, the invoice, as we understand the evidence, is an accounting document. It is designed primarily to document for Calcot the person to be paid the share of the marketing proceeds attributable to individual bales and to provide the information needed to compute the amount of the advance payment and the final settlement for each bale. Until the invoice card is received, no account is set up by Calcot in the grower's name. When it is received, Calcot for the first time establishes a record which shows the person who is to be paid the share of marketing proceeds attributable to the bales of cotton referred to in the invoice card.

It is wholly unrealistic to say, as does petitioner, that he retained title to the cotton until January following the year of harvest when an invoice card was sent to Calcot. By that time the cotton had been delivered to Calcot; it likely had already been sold by Calcot, and possibly it had already been spun into yarn and woven into fabric. The documents of title [7] are quite clearly the "Negotiable Yard Receipt Original," issued by the gin, and the "Negotiable Public Warehouse Receipt," issued by the Calcot Compress and Warehouse, used in conjunction with the trucker's acknowledgment of receipt.

Petitioner seeks to bolster his position by defining the word "delivery," as used in the marketing agreement, to mean the invoicing of the cotton. In support of this interpretation, petitioner offered a stipulated copy of resolutions of Calcot's board of directors, adopted on June 24, 1969, stating that the term "delivery," as used in the marketing agreement, would be so regarded, and further that title to the cotton is deemed to pass from the member to Calcot upon the invoicing of the cotton. We agree with respondent that these resolutions, adopted

---

[7] Cal. Comm. Code (West 1964) :
Sec. 1201. General Definitions. * * *

\* \* \* \* \* \* \*

(15) "Document of title" includes bill of lading, dock warrant, dock receipt, warehouse receipt, gin ticket, compress receipt, and also any other document which in the regular course of business or financing is treated as adequately evidencing that the person entitled under the document (Section 7403(4)) has the right to receive, hold and dispose of the document and the goods it covers. To be a document of title a document must purport to be issued by a bailee and purport to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.

\* \* \* \* \* \* \*

(45) "Warehouse receipt" means a document evidencing the receipt of goods for storage issued by a warehouseman (Section 7102), and which, by its terms, evidences the intention of the issuer that the person entitled under the document (Section 7403(4)) has the right to receive, hold and dispose of the document and the goods it covers. Designation of a document by the issuer as a "warehouse receipt" is conclusive evidence of such intention.

[Section references are to Cal. Comm. Code (West 1964).]

after all the transactions here in question had occurred, are irrelevant and contrary to the language as well as the interpretation given the marketing agreement by the parties. Further, the resolutions are inconsistent with the practical fact that Calcot expeditiously sold the cotton received from its members without regard to whether it had been invoiced. We note also that the vice president and treasurer of Calcot testified that the resolutions were not adopted to clarify Calcot's relationships with its members but as an accommodation to some of them in their dealings with the Internal Revenue Service.[8]

The cases relied upon by petitioner are all factually distinguishable. *Campbell* v. *Prothro*, 209 F. 2d 331 (C.A. 5, 1954), involved the donation to a charity of 100 head of calves to be selected by the donee's agent from a larger herd. In *White* v. *Brodrick*, 104 F. Supp. 213 (D. Kan. 1952), the taxpayer donated to charity a specified number of bushels of wheat which he had raised and stored. In *Stuart A. Rogers*, 38 T.C. 785 (1962), the taxpayer contributed a $10,000 equity in a timber stand. In each case the subject of the gift was ultimately sold, and the Commissioner sought to include in the taxpayer's gross income the sales proceeds paid to the charity. The courts held that the farm products were not income per se and that the use of those products by the taxpayer in making charitable gifts did not cause the recognition of taxable income. See also *Elsie SoRelle*, 22 T.C. 459, 476-479 (1954); *Estate of W. G. Farrier*, 15 T.C. 277, 283-284 (1950).

In all these cases, gifts were made of the farm products as such. In none of these cases had steps been taken to market the farm products leaving the taxpayer with the right only to receive the proceeds from the sales.[9] In the instant case, as discussed above, when petitioner made his church gifts, he had only a right to share in the sales proceeds. The factual situation, in substance, is no different than it would have been if he had received the payments from Calcot, deposited them in his bank account, and then transmitted the money to the church.

Notwithstanding petitioner's argument to the contrary, the foregoing conclusion does not conflict with the doctrine of constructive receipt or require his income to be reported in the year the cotton was harvested. See sec. 1.451-2(a), Income Tax Regs. Farmers have great flexibility in timing the receipt of taxable income from harvest-

---

[8] Calcot evidently accommodated its members in other ways. Since the church was not engaged in the production of any agricultural products and owned no land used for that purpose, it was not eligible for membership in the association under the controlling statute, Cal. Agric. Code sec. 54231 (West 1968) (see also Cal. Agric. Code sec. 1195 (West 1954), the predecessor of sec. 54231), or sec. 2.01 of the bylaws of the association, quoted in our Findings. Yet the church was admitted to membership during the tax years. Calcot's vice president and treasurer candidly admitted that: "Today, if we * * * [knew] the church did not produce cotton, it could not become a member."

[9] See Eustice, "Contract Rights, Capital Gain, and Assignment of Income — the Ferrer Case," 20 Tax L. Rev. 1, 36-41 (1964).

ed crops. They may sell the crops immediately; they may hold them until the next taxable year; or they may sell them in one year under a contract calling for payment in a later year. Where a farmer reporting on a cash basis, as does petitioner, delivers his crop to a buyer under a bona fide agreement that payment is to be made the following year, the farmer does not constructively receive income at the time of the delivery; he does not receive taxable income until his crop is reduced to cash. *J. D. Amend*, 13 T.C. 178 (1949); see *Hineman* v. *Brodrick*, 99 F. Supp. 582 (D. Kan. 1951); Halstead, Federal Income Taxation of Farmers 24 (1961); cf. *S. M. Friedman*, 41 T.C. 428, 435, 436 (1963), affd. 346 F. 2d 506 (C.A. 6, 1965).

In this case, petitioner's cotton has consistently been turned over to Calcot in the year it was harvested, and petitioner has reported his share of the proceeds in the year he received the cash. There has been no showing when any particular bales of cotton were sold by Calcot, or the terms of any sales that took place during the year the cotton was harvested.[10] Unless petitioner obtained an advance against his cotton, he would not receive any money until the final settlement with Calcot shortly after June 30 of the year following the harvest. Even if he received an advance in the year the cotton was harvested, the record does not show the terms of the instruments he was required to sign in order to receive the advance or the procedures involved in the final settlement. Therefore, it is impossible for us to determine whether the advances received in the year of harvest were taxable income or loan proceeds. Cf. *Harold Arlen*, 48 T.C. 640 (1967). We do not think the record would permit a holding that petitioner constructively received the proceeds from his cotton in the year it was harvested.

*Decision will be entered for the respondent.*

---

[10] Cf. Rev. Rul. 58-162, 1958-1 C.B. 234; Rev. Rul. 70-294, 1970-1 C.B. 13.