J. K. Griffith and Erma Griffith, Petitioners *v.*
Commissioner of Internal Revenue, Respondent

Curtis C. Griffith and Cynthia A. Griffith, Petitioners
*v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 4935–77, 4936–77.    Filed February 28, 1980.

*William Norton Baker* and *Karl Norman Clifford,* for the petitioners.
*Frank C. Hider, Jr.,* for the respondent.

Simpson, *Judge:* The Commissioner determined the following deficiencies in the petitioners' Federal income taxes for 1973:

| Docket No. | Petitioners | Deficiency |
| --- | --- | --- |
| 4935-77 | J. K. Griffith and Erma Griffith.............. | $1,568,144.91 |
| 4936-77 | Curtis C. Griffith and Cynthia A. Griffith.. | 145,889.92 |

After concessions by the petitioners, the issue for decision is whether the petitioners received in 1973 all the income from their sale of cotton in that year under a sales contract which deferred payment until later years and which was secured by a standby letter of credit. If they did receive such income in such year, we must then decide whether they are entitled to elect to use the installment method for reporting such income.

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, J. K. and Erma Griffith, were husband and wife throughout 1973. Their son and daughter-in-law, petitioners Curtis C. and Cynthia A. Griffith, were also husband and wife throughout 1973. All the petitioners maintained their legal

residences in Morton, Tex., when they filed their petitions in this case, and each couple filed its joint Federal income tax return for 1973, using the cash method of accounting, with the Internal Revenue Service, Austin, Tex. J. K. Griffith and Curtis Griffith will sometimes be referred to as the petitioners.

In 1973 and prior years, the petitioners' primary business was farming. From 1967 to 1973, they accumulated more than 16,000 unsold bales of cotton from their farming operations. Most of the bales belonged to J. K. and Erma, but about 10 percent of the bales belonged to Curtis and Cynthia. The petitioners chose to accumulate and store the cotton in lieu of selling it immediately upon harvesting because the price of cotton was depressed during the years 1967 through 1972, and they believed the price would improve. The cotton was stored in public compresses, and the compresses issued negotiable warehouse receipts for the cotton.

By 1973, prices had indeed risen, and the petitioners decided to sell. Although their normal practice was to sell cotton for cash, they decided to sell most of the cotton under a deferred payment arrangement. To that end, on September 10, 1973, they entered into a deferred payment sales contract (the sales contract) with Dunavant Enterprises, Inc. (Dunavant), a large cotton dealer, for the sale of most of the accumulated cotton.[1] Dunavant agreed to buy 6,066,308 pounds of the cotton, or about 12,431 bales, at a cash price of 44.5 cents per pound. Dunavant also agreed to pay the purchase price in future years only, with 7-percent interest. The total deferred purchase price for the 6,066,308 pounds with the interest was computed to be $3,376,508.

The sales contract provided in pertinent part:

2. * * * Such purchase price shall be due and payable as follows:
$647,887 on January 5, 1975, for 1,164,008 pounds of cotton
$647,887 on January 5, 1976, for 1,164,008 pounds of cotton
$647,887 on January 5, 1977, for 1,164,008 pounds of cotton
$647,887 on January 5, 1978, for 1,164,008 pounds of cotton
$784,960 on January 5, 1979, for 1,410,276 pounds of cotton.

Such purchase price shall be secured by an irrevocable and non-negotiable letter of credit or other guaranty acceptable to Seller from a bank acceptable to Seller. It is understood and agreed by the parties hereto that no payment of

---

[1]Griffith Enterprises, Inc., a Texas corporation, was named in the sales contract, along with the petitioners, as one of the sellers. However, the parties herein have stipulated that Griffith Enterprises, Inc., owned none of the cotton and was entitled to none of the sale proceeds.

any kind shall be made by the Buyer to Seller on account thereof prior to the time that such payment is to be made as set forth above. * * *

3. This contract shall be non-negotiable and nontransferable under the laws of the United States, the State of Texas, or any other state.

4. At the time of such delivery, title to the cotton shall pass to Buyer and the warehouse receipt covering the cotton purchased hereunder shall be delivered to Buyer by Seller. At that time, Seller shall receive the above described letter of credit or guaranty.

On September 14, 1973, the sale was closed in Lubbock, Tex. At such time, J. K. Griffith executed a document in which he promised, on behalf of the petitioners, to reimburse Dunavant should the cotton prove, on inspection, not to be of the weights and grades which had been represented. In addition, the petitioners delivered to Dunavant warehouse receipts covering the cotton, and Dunavant delivered to the petitioners a letter of credit dated September 13, 1973, issued by First National Bank of Memphis, Tenn. (First National). The letter of credit was in the face amount of $3,376,508—the total deferred purchase price—and named as beneficiaries J. K. Griffith, Curtis Griffith, and Griffith Enterprises, Inc.

The letter of credit read in pertinent part:

We hereby authorize you to draw on First National Bank of Memphis, Memphis, Tennessee for account of:

> Dunavant Enterprises, Inc., P. O. Box 443,
> Memphis, Tennessee 38118

available by your drafts at sight to be accompanied by the following:

Your certificate executed by an authorized official of Curtis Griffith, J. K. Griffith and Griffith Enterprises, Inc. stating that Dunavant * * * has defaulted under the terms and conditions contained in that certain Deferred Payment Sales Contract dated September 10, 1973 covering purchase and delivery of 6,066,308 pounds of cotton.

* * * * * * *

No pre-payment is allowed.

This Letter of Credit is non-transferable.

By a printed clause, the letter of credit was made subject to the Uniform Customs and Practice for Documentary Credits (1962 rev.), and by an amendment of September 17, 1973, it was made irrevocable. In another printed clause, First National engaged:

with drawers and/or bonafide holder's [sic] that drafts drawn and negotiated in conformity with the terms of this credit will be duly honored on presentation and that drafts accepted within the terms of this credit will be duly honored at maturity.

Although both the sales contract and the letter of credit were by their terms nontransferable, Dunavant had no reason to object to a transfer of those documents. In fact, First National required Dunavant to put up certificates of deposit equal to Dunavant's obligation under the sales contract as a condition of First National's issuing the letter of credit. Thus, Dunavant in September 1973, had already raised and surrendered the entire purchase price of the cotton and had no particular interest in the ownership of the sales contract or the letter of credit.

In their Federal income tax returns for 1973, the petitioners reported no income as a result of the sale of the cotton under the sales contract. J. K. and Erma Griffith owned 89.646 percent of such cotton, and in his notice of deficiency to them, the Commissioner determined that they received $2,420,000.05 as the cash value of the cotton sold by them in 1973 under the sales contract. Curtis and Cynthia Griffith owned 10.354 percent of the cotton sold in 1973 under the sales contract, and in his notice of deficiency to them, the Commissioner determined that they received $279,506.95 as the cash value of the cotton sold by them in 1973. Accordingly, he determined deficiencies based on their failure to report such amounts.

OPINION

The only issue for decision is whether the petitioners were required to report the cash sales price of their cotton as income in 1973. The Commissioner contends that the petitioners actually received such income in 1973 as a result of the sales contract and standby letter of credit; alternatively, he maintains that under section 446(b) of the Internal Revenue Code of 1954,[2] they are required to report such income in that year in order to clearly reflect their income. The petitioners contend that they did not actually receive the income in 1973 and, in the alternative, that they are entitled to elect to use the installment method for reporting the income from the sale of their cotton.

Section 1001(a) provides that the gain from the sale of property shall be the excess of the amount realized therefrom over the adjusted basis of the property. Section 1001(b) provides that the amount realized shall be the sum of any money received

---

[2]All statutory references are to the Internal Revenue Code of 1954 as in effect during the year in issue, unless otherwise indicated.

plus "the fair market value of the property (other than money) received." Section 1002 states that "Except as otherwise provided in this subtitle * * * the entire amount of the gain or loss, determined under section 1001, shall be recognized."[3] Section 451, dealing with the time for reporting income, provides that "The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer." Section 1.451–1(a), Income Tax Regs., further provides that a cash method taxpayer shall include in gross income amounts "when actually or constructively received."

There has been a host of cases involving the question of when an amount is realized for purposes of section 1001. In a number of cases, this Court has held that an amount is realized when a seller receives property which is the equivalent of cash. *Watson v. Commissioner*, 69 T.C. 544, 549 (1978), on appeal (5th Cir., Apr. 3, 1978); *Western Oaks Building Corp. v. Commissioner*, 49 T.C. 365, 376 (1968); *Ennis v. Commissioner*, 17 T.C. 465, 470 (1951); *Atkins v. Commissioner*, 9 B.T.A. 140, 150 (1927), affd. 36 F.2d 611 (D.C. Cir. 1929). However, the Court has also held that a mere contractual right to future payments generally is not the equivalent of cash and does not constitute an amount realized. *Schniers v. Commissioner*, 69 T.C. 511 (1977); *Sheldon v. Commissioner*, 62 T.C. 96, 110 (1974); *Ennis v. Commissioner*, *supra*.

*Watson v. Commissioner*, *supra*, decided by us recently, is similar to the case now before us. In *Watson*, the taxpayer, on November 29, 1973, sold and delivered in Texas a quantity of cotton for $42,146.51. The purchaser, in lieu of paying cash upon receipt of the cotton, issued a "deferred payment authorization," nontransferable by its terms, whereby a named bank with whom the purchaser had established a line of credit was authorized to pay to the taxpayer in January 1974 the $42,146.51 upon the taxpayer's presentment and endorsement of the deferred payment authorization. The bank also issued to the taxpayer a letter of credit in which it acknowledged the purchaser's line of credit and promised to pay $42,146.51 in January 1974 upon presentment and endorsement of the deferred payment authorization. We held that the letter of credit was the equivalent of cash and

---

[3] Sec. 1002 was repealed by the Tax Reform Act of 1976, Pub. L. 94–455, sec. 1901(a)(121), 90 Stat. 1799, and similar language now appears in sec. 1001(c), effective for taxable years beginning after Dec. 31, 1976.

that, therefore, the taxpayer had received the $42,146.51 of income in 1973. The holding followed from our findings that the right to the payments under the letter was subject to no contingencies and that, under Texas law, the taxpayer could have assigned his right to the proceeds of the letter of credit and thus received substantially the entire face value of the credit. (69 T.C. at 549.)

The Commissioner contends that *Watson* controls the present case, but the petitioners seek to distinguish that decision in several ways. They point out that in *Watson*, there was a commercial letter of credit; they argue that the standby letter of credit involved in this case is materially different. However, in our opinion, the difference is not significant.

In the case of the commercial letter of credit in *Watson*, the taxpayer could collect from the bank upon the presentation of the "deferred payment authorization"; whereas, in this case, under the standby letter of credit, the petitioners had to present their certification that Dunavant had defaulted in payment. Yet, in both *Watson* and this case, the underlying contract had been wholly performed by the seller; thus, there were no conditions to be performed by the seller which might relieve Dunavant or First National of the obligation to pay. Once the time for payment arrived, the petitioners could seek payment from Dunavant, but if it failed to do so, the petitioners could then prepare the required certification and demand payment of First National. Under such circumstances, the default by Dunavant and the preparation of the certification constituted no material obstacle to the petitioners' ability to collect the funds. See *Stiles v. Commissioner*, 69 T.C. 558 (1978); *Pozzi v. Commissioner*, 49 T.C. 119 (1967). The petitioners rely on *Robinson v. Commissioner*, 44 T.C. 20 (1965), but it involved altogether different facts.

The second distinction urged by the petitioners is that their letter of credit was expressly made nontransferable unlike the letter of credit in *Watson*. They also insist that they could not circumvent such limitation merely by assigning the proceeds of the letter, as distinct from assigning the letter itself.

In *Watson*, we never found that the letter of credit itself was transferable; but we did rule that under the Texas version of the Uniform Commercial Code, the proceeds of the letter of credit were transferable regardless of the transferability of the letter

itself. We found that the right to transfer the proceeds of the letter was equivalent to cash.

In the case at bar, the petitioners and the Commissioner agree that the letter of credit was not governed by the commercial code; they agree that it is governed by the Uniform Customs and Practice for Documentary Credits (1962 rev.) (U.C.P.), since the issuing bank was nationally chartered and the letter expressly invoked the U.C.P. See R. Gewolb, "The Law Applicable to International Letters of Credit," 11 Vill. L. Rev. 742, 749 (1966). Article 46 of the U.C.P. provides that a letter of credit may be transferred only if it is expressly designated as transferable. Such provision obviously precluded transfer of the petitioners' letter of credit since their letter was expressly *non*transferable. The U.C.P. is silent on the question of transferability of proceeds; however, the petitioners insist that article 46 embraces proceeds within its rule against transferability, and they rely on *Eriksson v. Refiners Export Co.*, 264 App. Div. 525, 35 N.Y.S.2d 829 (1st Dept. 1942) (dealing with the predecessor of art. 46).

*Eriksson* does, indeed, clearly support the petitioners' position; nevertheless, we are not persuaded by the petitioners' argument nor by their reliance on *Eriksson*. *Eriksson* was decided by an inferior State court nearly 40 years ago, and it included little worthwhile discussion of the issue. Moreover, a later case held that the predecessor of article 46 did not proscribe every type of transfer of the benefits of a letter of credit. *Kingdom of Sweden v. New York Trust Co.*, 197 Misc. 431, 96 N.Y.S.2d 779 (N.Y. County Sup. Ct. 1949). On the merits of the issue, we are convinced that article 46 did not apply to an assignment of proceeds of letters of credit.

In commercial practice, a distinction between the transfer of a letter of credit and a transfer of its proceeds has existed since well before the 1962 revision of the U.C.P. See S. Mentschikoff, "Letters of Credit: The Need for Uniform Legislation," 23 U. Chi. L. Rev. 571, 600–609 (1956); H. Harfield, "Secondary Uses of Commercial Credits," 44 Colum. L. Rev. 899, 907–908 (1944); G. McGowan, "Assignability of Documentary Credits," 13 Law & Contemp. Prob. 666, 683 (1948); R. Waldmann, "Increasing the Transferability of Documentary Letters of Credit," 8 Harv. Int'l L. J. 116, 125 (1967). In the usual transaction involving a letter of credit, the credit exists not only to ensure that its beneficiary is paid on the underlying contract, but also to ensure that the

beneficiary performs his part of that contract. The beneficiary's right to the benefits of the credit is contingent upon his complete performance. In such a situation, a transfer of the letter of credit is considered to transfer with it the duty of performance by the beneficiary. Accordingly, the recipient of that performance may well have an interest in preventing transfer, in order to ensure that the intended person renders performance. See H. Harfield, *supra* at 908. On the contrary, an assignment of proceeds transfers only the beneficiary's right to payment under the letter of credit; those payments are still contingent on the original beneficiary's performing his part of the bargain. H. Harfield, *supra*. Thus, the policy behind the rule against transfer of the letters is inapplicable to assignments of proceeds. In the present case, Dunavant had no reason to object to the transfer of the letter of credit or its proceeds since, after the petitioners delivered the cotton, Dunavant was owed no further performance.

In a 1974 revision of the U.C.P., an article 47 was added providing: "The fact that a credit is not stated to be transferable shall not affect the beneficiary's rights to assign the proceeds of such credit in accordance with the provisions of the applicable law." The petitioners argue that, presumably, article 47 was adopted to change the applicable rules; thus, before its adoption, assignment of the proceeds of a letter of credit must not have been allowable. However, the U.C.P. is merely "the expressed understanding of international credit bankers in the United States and abroad as to practices prevailing in their trade." R. Gewolb, *supra* at 749. Since we know that the assignment of proceeds was a recognized practice before 1974, there is no basis for concluding that article 47 changed the applicable rule. In fact, that article merely codified the recognized practice. Accordingly, we conclude that article 46 did not prohibit the assignment of proceeds in 1973.

The assignability of the proceeds of the letter of credit thus turns on the State law in Texas and Tennessee. In either case, the result is exactly as in *Watson:* proceeds may be transferred regardless of the transferability of the letter of credit. Tex. Bus. & Com. Code Ann. sec. 5.116(b) (Vernon 1968); Tenn. Code Ann. sec. 47–5–116(2) (1979). Therefore, we hold that the petitioners could in 1973 have assigned their rights to the proceeds of the letter of credit. In addition, under Tex. Bus. & Com. Code Ann.

secs. 9.318(c) and (d) and 9.106 (Vernon 1968), the sales contract, as an account, was assignable notwithstanding any provision in the contract to the contrary.

The petitioners also maintain that even if, as a matter of law, the letter of credit or its proceeds could be transferred, no transfer of them was possible as a practical matter. In support of their contention, the petitioners produced the testimony of several bankers who stated that because of the language of the documents purporting to prohibit transfer, the banks would have loaned no money against those documents. Based on such testimony, the petitioners argue that no reasonable person would have accepted a transfer of the letter of credit or an assignment of its proceeds, except at a large discount.

At the outset, we have some reservations about the significance of the testimony produced by the petitioners. Had they desired to assign the proceeds of the letter of credit, they could have secured a legal opinion as to the assignability of the proceeds, and the testimony of the bankers does not take into consideration what effect would be given to such a letter and whether, with it in hand, they would consider the letter of credit to have a value equal to the amount thereof. Moreover, even if the terms of the letter of credit had some effect on its transferability as a practical matter, here, we have a situation in which the transferability of a letter of credit has been restricted, but there is no business purpose for the restriction. Since the petitioners had delivered the cotton, Dunavant and First National had no interest in restricting the transferability of the letter of credit. The only possible reason for placing the restriction on the transfer of the letter appears to be to benefit the petitioners by modifying the tax consequences of its receipt. In view of the lack of business purpose for the restriction, and since no party to the letter of credit had any business reason for retaining the restriction, it appears to be a "fleeting" thing, and in our judgment, it should not alter the tax treatment of the letter. *Knetsch v. United States*, 364 U.S. 361 (1960); *Commissioner v. Court Holding Co.*, 324 U.S. 331 (1945); *Golsen v. Commissioner*, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), cert. denied 404 U.S. 940 (1971).

In conclusion, we find that there are no significant distinctions between this case and *Watson.* In both cases, the taxpayers, who were the sellers of cotton, had fully performed their part of the

transaction, and they had made arrangements to secure future payments for their cotton—they needed only to wait for the expiration of time. In *Watson,* we held that under such circumstances, the taxpayers had received the equivalent of cash at the time of the sale, and there is no reason to reach a different conclusion in this case. Accordingly, we hold that in 1973, the petitioners received the cash value of the cotton sold by them. In view of that conclusion, we need not pass on the Commissioner's alternative contention relating to section 446(b).

Now, we deal with the petitioners' contention that they are entitled to report the income from the sale of their cotton under the installment method authorized by section 453. Section 453(a)(1) allows "a person who regularly sells or otherwise disposes of personal property on the installment plan" to use the installment method for reporting income from such sales. Section 453(b)(1) provides for the use of the installment method for reporting income from:

(A) a sale or other disposition of real property, or

(B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000 * * *

However, section 453(b)(2) provides that section 453(b)(1) is applicable:

only if in the taxable year of the sale or other disposition—

(A) there are no payments, or

(B) the payments (exclusive of evidence of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

Section 453(a) applies only to dealers who regularly use the installment plan (*Davenport Machine & Foundry Co. v. Commissioner,* 18 T.C. 39 (1952)), and the petitioners admit that they cannot qualify under such provision.

The parties focused their arguments on the question of whether the petitioners' sale of cotton in 1973 constituted a casual sale of personal property within the meaning of section 453(b)(1)(B). The petitioners maintained that since they are not required to keep inventories, the cotton would not be includable in an inventory if on hand at the end of the year. However, we need not pass on the meaning of section 453(b)(1)(B) under these circumstances, since we have concluded that the petitioners

cannot qualify for the use of the installment method for another reason.

*Oden v. Commissioner*, 56 T.C 569 (1971), involved a sale of real estate in which the agreement provided that the price was to be paid in installments, but an escrow arrangement was established. After carefully analyzing the facts, we concluded the seller was no longer looking to the purchaser for the payment; rather, the seller expected to collect from the certificates of deposit which had been placed in escrow. As a result, we held that the seller had received a payment in excess of 30 percent of the selling price in the year of sale and therefore was not entitled to elect to use the installment method. See *Williams v. United States*, 219 F.2d 523 (5th Cir. 1955); *Pozzi v. Commissioner*, 49 T.C. 119 (1967). On the other hand, in *Porterfield v. Commissioner*, 73 T.C. 91 (1979), which involved a somewhat similar arrangement, we found that, despite the escrow arrangement, the seller expected to collect from the purchaser and that the escrow arrangement merely served as security for the performance by the purchaser. Accordingly, we held in *Porterfield* that the seller could use the installment method.

The standby letter of credit in this case is similar to the escrow arrangement in *Oden*. Although the petitioners were required first to seek payment from Dunavant, they could collect from First National if Dunavant did not pay merely by preparing a certification to that effect. We are not satisfied that the petitioners regarded the letter of credit merely as security for the obligation of Dunavant; it seems that the letter of credit in this case served the same economic effect as the escrow arrangement in *Oden*. Consequently, the petitioners should be considered to have received the entire cash value of their cotton crop in 1973 when the sale was made. Accordingly, we conclude and hold that the petitioners are not entitled to use the installment method for reporting the income from the sale of their cotton in 1973.

*Decisions will be entered for the respondent.*

Reviewed by the Court.

FAY, *J.*, concurs in the result.

QUEALY, *J.*, dissents.

NIMS, *J.*, concurring: Although I agree with the reasoning and conclusion of the majority, I would like to add a cautionary note for those who might be tempted to rely too literally upon the fact pattern approved of in *Porterfield v. Commissioner*, 73 T.C. 91 (1979), and discussed in the majority opinion. In *Porterfield*, this Court focused on the *intent* of the parties and held that payments in escrow intended and regarded solely as security for promissory notes are not payments for purposes of section 453.

The majority now implicitly eschews reliance on the *Porterfield* mode of analysis by not delving into the intent of the parties. Instead, the majority apprises the substance of the transaction in an objective light. In my view, that is the proper approach to these cases, and the continued vitality of *Porterfield* as a precedent would appear to be in doubt.

STERRETT, *J.*, dissenting: "Installment sales are not narrowly, or even primarily, the province of wealthy individuals, large corporations, and their sophisticated tax advisers. Sales for future payment are made by persons at virtually all economic levels—by individuals who are not wealthy, by small corporations, by persons lacking access to the most sophisticated tax advice. * * * [Due to its complexity, section 453 often] imposes an undue and never–intended burden on taxpayers who, through inability, inadvertence, or inadequate advice, fail to take steps that are now necessary to qualify their deferred payment sales for deferral of tax liability." Hearings on S. 1063 Before the Subcomm. on Taxation and Debt Management Generally of the Comm. on Finance, 96th Cong., 1st Sess. 43–44 (1979) (testimony of Martin Ginsburg). The instant case and the majority position thereunder exemplify the harrowing aspects of the foregoing testimony.

In 1971, this Court stated in *Oden v. Commissioner*, 56 T.C. 569 (1971), that funds placed in escrow as security for payment on a deferred payment contract are not constructively received in the year of sale. *Oden v. Commissioner, supra* at 575. Specifically, we stated that the facts and circumstances of each case were the determinative factors. *Oden v. Commissioner, supra* at 578. In *Oden*, the petitioner looked to and actually received payment from the escrow account, and accordingly, we found that the

escrow was not intended as security for the buyer's obligation. In the recent case of *Porterfield v. Commissioner*, 73 T.C 91 (1979), we applied the rule set out in *Oden* and "look[ed] back of the terms of the written agreements to find out what the parties actually intended" in determining whether an escrow was security or payment in the year of sales for the purpose of section 453. *Porterfield v. Commissioner, supra* at 95. Even though the escrow agreement in *Porterfield* provided that the escrow funds were to be paid to petitioner, we found that the parties' actions and intentions were to the contrary, and that the escrow served as security for the buyer's obligation. Therefore, we held that the petitioner was entitled to report the sale on the installment method.

The actions and intentions of petitioner in the instant case are clear. Petitioner received a nontransferable letter of credit. The agreement provided that the letter of credit was to serve as security and could only be collected in the event of default by the buyer. Further, as in *Porterfield*, there never was a default; petitioner looked to and received all payment from the buyer. Compare, *Oden v. Commissioner, supra* at 576. Further, unlike in *Porterfield*, the agreement in the instant case provided that the buyer was the primary obligor. Thus, the commonly understood meaning of the language used in the agreement and the action of the parties clearly establish that the letter of credit was intended and in fact served only as security.

In the instant case, the majority looked not at the language of the agreement or the actions of the parties as provided in *Oden* and *Porterfield* but instead to law review articles to find that petitioner was in constructive receipt of the proceeds under the letter of credit. I do not challenge the majority's analysis of the U.C.P. but only the necessity thereof. It implicitly asks too much of the taxpayer and his counsel. The issue is whether the letter of credit was security, and therefore, the majority's reliance on *Watson v. Commissioner*, 69 T.C. 544, 549 (1978), on appeal (5th Cir., Apr. 3, 1978), is misplaced. Petitioner has satisfied the test as set out in *Oden* and applied in *Porterfield*. Accordingly, he should be entitled to rely on our decisions therein and report the sale under the installment method.

When this Court demands certain taxpayers obtain a legal opinion letter on the transferability of proceeds under a nontransferable letter of credit, while excusing other taxpayers

for their failure to read or understand documents executed by them (as we did in *Porterfield*), we are creating the type of confusion and complexity about which Professor Ginsburg testified. Effectively, section 453 is no longer a relief provision allowing the taxpayer to defer taxation until receipt of the proceeds, but instead, a tax trap for the ill-advised. The line between *Oden, Porterfield,* and the instant case has become so convoluted as to create a web. Unfortunately, and unintentionally, only the wealthy individual or corporation with the "most sophisticated tax advice" will be able to avoid entanglement.

DRENNEN and WILBUR, *JJ.*, agree with this dissenting opinion.